IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  | : |  |
|---|---|---|
| ORTECK INTERNATIONAL INC. et al. | : |  |
| v. | : | Civil Action No. DKC 2005-2882 |
|  | : |  |
| TRANSPACIFIC TIRE & WHEEL, INC., et al. | : |  |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case are: (a) the motion of Defendant GITI Tire (USA) Ltd. to dismiss for lack of personal jurisdiction (paper 23); (b) the motion of Defendants TransPacific Tire & Wheel, Inc., Giti Tire China, GITI Tire (USA) Ltd., and Brian Chan (collectively "Defendants") to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) (paper 24); and (c) the motion of GITI Tire (USA) Ltd., to file exhibits under seal (paper 53). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion to dismiss for lack of personal jurisdiction will be denied. Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) will be granted in part and denied in part. The motion to seal will be denied, although GITI Tire (USA) Ltd., may renew its motion with a proper memorandum within 15 days.

## I.  Background

## A.  Factual Background

## 1.  The Distributorship Agreement

The following facts are either undisputed or viewed in the light most favorable to Plaintiffs.  In the fall of 2001, Sonny Veen, executive vice president of purchasing for Plaintiff Orteck International, Inc. ("Orteck"), traveled to China to meet with Y.C. Chong, a representative of Defendant Giti Tire China ("GT China").[1] Orteck claims that GT China then contracted with Orteck for Orteck to be the exclusive wholesale distributor of Kaiyuan and Runway brand GT tires.  In January 2002, Mr. Veen traveled to China for another meeting with GT China officials.  During this trip, Mr. Veen toured GT China's factory, and met with Mr. Chong and Defendant Mr. Chan, both employees of GT China.[2]  According to Orteck, following this second meeting, it contracted with GT China to be the exclusive wholesale distributor of another brand of GT China tires, the Primewell GT brand.  In early September 2002, officials from GT China and Orteck met in New York, at which time GT China "realized the substantial amount of business created by Orteck." Orteck alleges that GT China then "began a scheme to

---

[1] Orteck is a tire distributor that is incorporated and has its sole place of business in Maryland.

[2] Plaintiffs allege that Mr. Chan later went to work for Defendant TransPacific.

eliminate Orteck and tortiously obtain this significant business for itself." (Paper 3, at 6).

On January 10, 2003, Mr. Chong sent an e-mail to Orteck announcing that GT China had launched Defendant TransPacific Tire & Wheel, Inc. ("TransPacific"), a company incorporated in California. Orteck states that, despite the creation of the new company, it believed it was still dealing with GT China. Orteck states: "The operation of TransPacific and GT [China] was one and the same - GT [China] and TransPacific shared the same employees; employees of TransPacific sent emails from GT [China]'s domain name, e-grandtour.com; GT [China] exercised control over TransPacific's business decisions; and GT continued to ship containers of tires to Orteck." (Paper 3, at 6).

In February 2003, Mr. Chan, at the direction of GT China and TransPacific, asked Orteck to provide a copy of Orteck's customer list. Mr. Chan explained to Orteck that the list was needed to strengthen the relationship between the companies and to promote better customer satisfaction. Orteck agreed to provide the list, on the condition that GT China, TransPacific, and Mr. Chan agreed to keep the list confidential, not to solicit Orteck's customers, and to honor Orteck's contracts with GT China, pursuant to which Orteck claims it was the exclusive distributor of the Kaiyuan, Primewell, and Runway brand tires. Orteck maintains that GT China, TransPacific, and Mr. Chan "had no intention of honoring these

3

agreements," but instead secured the customer list so that they could sell directly to Orteck's customers at a cost lower than Orteck could charge, which they did.   Orteck alleges that when it demanded that they stop selling to its customers, they refused. Orteck claims that most of its customers no longer buy GT tires from Orteck because TransPacific now "undersells" Orteck.

## 2.   The Warehouse Agreement

At or around the time when GT China, TransPacific, and Mr. Chan allegedly interfered with Orteck's business, Ronny Hoesada of TransPacific traveled to Maryland to meet with Orteck officials. During the meeting, Mr. Hoesada proposed that the parties establish a warehouse in Silver Spring, Maryland, to store and distribute tires.   In April 2004, TransPacific and Orteck finalized the warehouse agreement and Orteck alleges that the parties agreed to split all of the warehouse expenses.   Pursuant to the warehouse agreement, Orteck advanced capital to rent the warehouse, outfitted the warehouse with equipment, and insured the building.   Orteck claims that at this time TransPacific and GT China refused to pay their share of the warehouse expenses and stopped properly filling Orteck's tire orders.   Instead, they "dumped surplus and unwanted product into the Maryland Warehouse." (Paper 3, at 9).   Following these shipment problems, Mr. Hoesada returned to Maryland to meet with Orteck officials.   Mr. Hoesada told Orteck he would fix the shipping problems and proposed that if Orteck would purchase the

4

warehouse, TransPacific would lease it from Orteck and use it as a storage and distribution facility.  Orteck agreed to the proposal and arranged to buy the warehouse.

Plaintiff Venetian Investments LLC ("Venetian") entered into a purchase agreement with the warehouse landlord and paid a $200,000 non-refundable deposit.[3]  In anticipation of leasing the warehouse to TransPacific, Orteck purchased additional equipment and made other improvements to the warehouse.  Plaintiffs maintain that although TransPacific representatives made at least four visits to Maryland between April and September 2004, TransPacific breached its agreement to lease the warehouse from Orteck.[4]  As a result, Orteck could no longer afford to purchase the property and incurred losses from its improvements to the property.[5]

Orteck alleges that following the breakdown of the warehouse deal, GT China and TransPacific continued to act to destroy Orteck's business.  Orteck states that GT China and TransPacific

---

[3] Venetian is organized under the laws of Maryland.  Venetian was formed for the purpose of purchasing and developing real estate in Maryland.  The relationship between Orteck and Venetian is unclear, but it appears that Orteck partnered with Venetian to purchase the Maryland warehouse.

[4] Plaintiffs state that the visits were "in furtherance of their fraudulent scheme," but do not provide any other information regarding the purpose for these visits.

[5] Pursuant to the terms of the existing lease on the warehouse, these improvements became part of the warehouse and the property of the warehouse landlord when Plaintiffs were unable to purchase the warehouse.

offered to make Orteck a wholesale seller of the Primewell brand of medium truck tires in the Northeastern United States, but that they "had no intention of carrying through on their offer."[6]   In addition, Orteck claims that GT China and TransPacific attempted to cash a letter of credit that Orteck had made at the Provident Bank of Maryland, even though Provident previously had notified GT China and TransPacific that the letter was expired and could no longer be cashed.   Orteck maintains that the attempt to cash the expired letter of credit caused damage to Orteck's business relationship with Provident.   (Paper 3, at 11).

**3.  The Creation of GITI USA**

On July 6, 2005, GITI Tire (USA) Ltd. ("GITI USA") was formed under the laws of Delaware.   Orteck states in its complaint that GITI USA "is a 100% subsidiary of GT and was formed for the purpose of taking over the functions of importing, selling and marketing GT brand tires from TransPacific," including sales and marketing to Orteck's customers.[7]   (Paper 3, at 3, 11).   Orteck claims that the same employees who worked at TransPacific work at GITI USA, including Sylvia Soerjadi, a clerk at TransPacific and president at

---

[6] The Primewell medium tires appear to be different from the Primewell tires that were part of the alleged exclusive distributorship agreement.

[7] After jurisdictional discovery, Plaintiff no longer claims that GITI USA is a subsidiary of GT, explaining instead that after an asset purchase by GITI USA of TransPacific's Chinese tire business, it is "a successor to TransPacific's operations." (Paper 51 at 2).

GITI USA, and Raymond Victor DeIorio, Jr., a vice-president at TransPacific and at GITI USA.  Orteck maintains that GITI USA was created in order to make it harder for Orteck to stop GT tire sales to its customers.

### 4.  Other Acts

Orteck alleges that GT China and its affiliates have conspired against other tire distributors to steal customers.  Orteck offers two examples - Reliable Tire Company ("Reliable) and Global Tire Network ("GTN").  In July 2002, Reliable filed a complaint against alleged GT affiliates PT. Gajah Tunggal ("Tunggal"); Seyan Trading, Inc., an affiliate of Tunggal ("Seyan"); and GT Tire USA, a division of Seyan.[8]  Orteck alleges that Reliable entered into a written distributorship contract with Seyan and that, despite performance of the contract for five years, Tunggal breached the contract when it suddenly ceased its supply of tires to Reliable.

Orteck also cites the example of GTN, a tire distributor that was formed under the laws of Ohio in 2001.  GTN established a network of customers for GT tire brands, and ordered GT tires through Seyan.  Orteck states that Seyan accessed GTN's customer list and began selling to GTN's customers directly.  GTN was forced out of business as a result.

_____

[8] Given the timing of the Reliable lawsuit, GITI Tire USA appears to be a different entity than Defendant GITI USA, which was not formed until 2005.

**B.  Procedural Background**

On October 21, 2005, Plaintiffs filed a complaint against Defendants GT China, TransPacific, and Mr. Chan, pursuant to 28 U.S.C. §§ 1331 and 1332.  (Paper 1).  On November 4, 2005, Plaintiffs filed an amended complaint, adding Defendant GITI USA. (Paper 3).

The amended complaint alleges the following claims: (a) Count I, fraud, against GT China, TransPacific, and Mr. Chan; (b) Count II, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), against all Defendants; (c) Count III, violation of RICO, 18 U.S.C. § 1962(c), against all Defendants; (d) Count IV, violation of RICO, 18 U.S.C. § 1962(d), against all Defendants; (e) Count V, negligent misrepresentation, against GT China, TransPacific, and Mr. Chan; (f) Count VI, breach of contract, against GT China and TransPacific; (g) Count VII, conversion, against GT China, TransPacific, and Mr. Chan; (h) Count VIII, intentional interference with contractual and business relations, against GT China, TransPacific, and Mr. Chan; (i) Count IX, unjust enrichment, against all Defendants; (j) Count X, promissory estoppel, against GT China, TransPacific, and Mr. Chan; (k) Count XI, injunction – preliminary and permanent, against all Defendants; (l) Count XII, accounting, against all Defendants; and (m) Count XIII, conspiracy, against all Defendants.[9]  Plaintiffs

---

[9] The conversion claim is incorrectly referred to as Count VI in the amended complaint.  (Paper 3, at 24).

seek compensatory and punitive damages, attorneys' fees and costs, and injunctive relief.[10]   Plaintiffs also request that the court order Defendants to account fully and completely for all sales of GT products to Orteck's customers.

On November 18, 2005, Orteck filed a motion for a preliminary injunction, which the court denied at a hearing held on January 6, 2006.   On January 5, 2006, Defendant GITI USA filed a motion to dismiss for lack of personal jurisdiction.[11]   (Paper 23).   On the same day, Defendants TransPacific, Mr. Chan, and GITI USA moved to dismiss Counts I through VIII, X, and XIII pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6).   (Paper 24).   Giti Tire China ("GT China"), a tire supplier headquartered in Shanghai, China, was served on or around April 17, 2006, and joined in the motion to dismiss.   (Paper 46).[12]

## II. Motion to Dismiss for Lack of Personal Jurisdiction

## A. Standard of Review

When a court's power to exercise personal jurisdiction over a nonresident defendant is challenged by a motion under Fed.R.Civ.P.

---

[10] Plaintiffs seek treble damages on the RICO claims.

[11] On January 25, 2006, the parties filed a joint stipulation in which, among other things, they agreed to engage in jurisdictional discovery.   (Paper 31).

[12] On May 4, 2006, Plaintiffs filed an opposition to GT China's joinder in the motion to dismiss, incorporating by reference the arguments set forth in their earlier opposition memorandum filed on February 13, 2006.   (Paper 50).

12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)).  If the existence of jurisdiction turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing, or may defer ruling pending receipt of evidence relevant to the jurisdictional question at trial. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989).  If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits and discovery materials, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md.*, 334 F.3d at 396; *see also Mylan Labs.*, 2 F.3d at 60; *Combs*, 886 F.2d at 676.  In determining whether the plaintiff has proven a prima facie case of personal jurisdiction, the court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan Labs.,* 2 F.3d at 60; *Carefirst of Md.*, 334 F.3d at 396.

## B.   Analysis

GITI USA argues that the court may not assert personal jurisdiction over it because it lacks sufficient contacts with Maryland.  Plaintiffs argue in response that the court may exercise

personal jurisdiction because GITI USA has both transacted business and contracted to supply goods to Maryland under the relevant portions of the Maryland long-arm statute.[13]   In addition, Plaintiffs argue that the court may exercise personal jurisdiction over GITI USA by attributing TransPacific's contacts with Maryland to GITI USA under "agency, alter ego, or successor" theories of personal jurisdiction.  (Paper 51, at 10).  In the alternative, Plaintiffs argue that exercising personal jurisdiction is proper by virtue of the RICO statute's nationwide service of process provision.

--------

[13] Maryland's long-arm statute states, in pertinent part:

(a) If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply goods, food, services, or manufactured products in the State;
> (3) Causes tortious injury in the State by an act or omission in the State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

Md. Code Ann., Cts. & Jud. Proc. § 6-103.

A federal district court may exercise personal jurisdiction over a non-resident defendant "if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4ᵗʰ Cir. 1993). The Court of Appeals of Maryland has "consistently held that the that the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15 (2005). Yet, courts may not "simply dispense with analysis under the long-arm statute," but rather, must interpret it "to the limits permitted by the Due Process Clause when [they] can do so consistently with the canons of statutory construction." *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6 (2006).

## 1.   Maryland Long-Arm Statute

Plaintiffs assert that personal jurisdiction is proper under both subsections (b)(1) and (b)(2). With respect to subsection (b)(1), a "nonresident who has never entered the State . . . may be deemed to have 'transacted business' in the State within the meaning of subsection (b)(1) as long as his or her actions culminate in '*purposeful activity*' within the State." *Sleph v. Radtke*, 76 Md.App. 418, 427 (1988) (emphasis added), *cert. denied*, 314 Md. 193 (1988); *Mohamed v. Michael*, 279 Md. 653, 658 (1977);

*Snyder v. Hampton Indus., Inc.*, 521 F.Supp. 130, 141 (D.Md. 1981) ("[A] nonresident who has never entered the state, either personally or through an agent, may be deemed to have 'transacted business' in the state within the meaning of subsection (b)(1)."), *aff'd*, 758 F.2d 649 (4th Cir. 1985).  The question is simply whether "a commercial actor's efforts have been 'purposefully directed' toward residents of another state." *Sleph*, 76 Md.App. at 429.  In addition, the location of any contract formation leading to the transaction of business is irrelevant because "the statutory test [of transacting any business] may be satisfied by a showing of other purposeful acts performed by the [defendant] in this State in relation to the contract, albeit preliminary or subsequent to its execution."  *Novack v. Nat'l Hot Rod Ass'n*, 247 Md. 350, 356-57 (1967) (quoting *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 457 (1965)).  Finally, even a single contact with the forum can satisfy the transaction of business standard in subsection (b)(1).  *Jason Pharm., Inc. v. Jianas Bros. Packaging Co.*, 94 Md.App. 425, 432 (1993).

Subsection (b)(2) is implicated if a defendant's "contracts with Maryland customers require [defendant] to arrange for and cause the physical delivery of the goods into Maryland," even if the defendant "has never been in the state." *Snyder*, 521 F.Supp. at 144, 145 (internal quotation marks omitted).  Thus, whether the actual carrier of goods was an "agent of the nonresident or an

independent contractor is irrelevant" because "in both situations the defendant has purposefully, to obtain a profit, entered into a transaction having the same substantial effects within the state." *Id.* at 145 (internal quotation marks omitted).   When personal jurisdiction is based on subsection (b)(1) or (b)(2), § 6-103(a) of the Maryland long-arm statute must be satisfied.   Subsection (a) requires that the plaintiff's cause of action must arise from the acts enumerated in subsections (b)(1) and (b)(2).   Plaintiffs assert that personal jurisdiction is proper based on the allegations of tire sales by Defendants to former Orteck customers, a listing of which Plaintiffs attached to their motion for a preliminary injunction.   (Paper 5, ex. F).   Eight Orteck customers are listed in Plaintiffs' exhibit, only one of whom,   "Heafner (ATD)," is relevant to the personal jurisdiction analysis because, as will be discussed, it is the only former Orteck customer in Maryland to whom GITI USA has sold tires.[14]   *Id.*

GITI USA makes two arguments to demonstrate a lack of personal jurisdiction.   First, GITI USA states that none of these former Orteck customers "reside in the state of Maryland," and that the "one Maryland customer that GITI (USA) does do business with is not and was not an Orteck Customer."[15]   (Paper 23, at 6).   Second, GITI

---

[14] ATD is known formally as American Tire Distributors, Inc.

[15] The Maryland customer whom GITI USA references is Monroe Muffler, doing business as Mr. Tire, of Baltimore, Maryland.
(continued...)

USA argues that it did not come into existence until after the allegations contained in the amended complaint, which was filed on November 4, 2005, had already occurred.   In support of this argument, GITI USA explains that it "began its operations on November 1, 2005, after acquiring the assets of TransPacific Tire & Wheel, Inc. ('TransPacific') relating to its business with Chinese tire manufacturers." (Paper 23, at 2).   In addition, GITI USA states that it was not authorized to do business until November 1, 2005.[16]  (Paper 23, at 1).

Both of GITI USA's arguments are undermined by a document it produced during jurisdictional discovery: an order acknowledgment on GITI USA letterhead dated August 19, 2005 – more than two months before the date on which the amended complaint was filed – indicating a shipment of tires to be delivered "immediately" to ATD in Landover, Maryland.   (Paper 51, ex. C, GITIUSA 000002). Moreover, Mr. DeIorio concedes in both his affidavit and in his deposition that ATD is a regular customer with a Maryland location. (Paper 23, ex. 1, DeIorio aff. ¶ 11; Paper 51, ex. E, DeIorio dep. at 29-32).   These discovery materials show that: (1) GITI USA made

---

[15](...continued)
(Paper 23, ex. 1, DeIorio aff. ¶ 8).  Neither Monroe Muffler nor Mr. Tire is listed as a former Orteck customer.  (Paper 5, ex. F).

[16] Both of these statements are supported by the affidavit, which is attached to GITI USA's memorandum, of GITI USA's Executive Vice President of Sales and Marketing, Mr. DeIorio. (Paper 23, ex. 1, DeIorio aff. ¶¶ 3, 4).

arrangements to ship tires to a former Orteck customer's Maryland location and (2) that GITI USA was transacting business before the filing of the amended complaint on November 4, 2005.   Thus, the evidence contradicts GITI USA's arguments that it did not do business with former Orteck customers in Maryland.

In addition, the evidence refutes GITI USA's assertion that it did not exist until after the events in question occurred.   GITI USA argues that because it was not doing business until November 2005, it could not have been involved with the exclusive distribution agreement, which was allegedly formed in 2001 and 2002, or with the acquisition of Orteck's customer list, which allegedly occurred in 2003.   Orteck's claim that GITI USA participated in a conspiracy to defraud it and steal its former customers, however, involves conspiracy allegations that continue to this day.   GITI USA need not have existed at the time the alleged exclusive distributorship agreement was formed or when the customer list was allegedly misappropriated, in order to have engaged in this conspiracy.   The conspiracy allegation is centered around tire sales to former Orteck customers and the August 19, 2005, order acknowledgment is evidence that GITI USA was engaged in a business transaction with a former Orteck customer in Maryland before the date of the amended complaint.

Plaintiffs' prima facie showing is sufficient for this court to exercise personal jurisdiction under subsections (b)(1) and

(b)(2).   Because GITI USA provided ATD with tires in Maryland, it transacted business under subsection (b)(1) with a former Orteck customer.[17]   Subsection (b)(2) also is implicated because GITI USA contracted to supply goods in Maryland before the date of the complaint.[18]   Furthermore, subsection (a) of the long-arm statute is satisfied because the cause of action arises from those acts. Plaintiffs' amended complaint states that GITI USA was formed "for the purpose of taking over TransPacific's sales of GT tires.  These sales include TransPacific's tire sales to Orteck's customers." (Paper 3, ¶ 20).  The sale of tires to a former Orteck customer in Maryland would satisfy the requirement in subsection (a) that the cause of action arise from contacts with the forum when personal jurisdiction is exercised pursuant to subsections (b)(1) or (b)(2). As noted, ATD is one of the eight former Orteck customers listed in Plaintiffs' exhibit.

---

[17] GITI USA states that Mr. Tire is the sole Maryland customer with whom it "does do business." (Paper 23 at 6).  However, "the 'transacting business' test of subsection (b)(1) requires less contacts with the forum than are necessary to satisfy a 'doing business' standard," which is the standard set forth in some states' long-arm statutes. *Snyder*, 521 F.Supp. at 137 (collecting Maryland authorities that conclude that transacting business requires less contacts with the forum).

[18] GITI USA's argument that ATD is not a Maryland customer because it does not "reside" in Maryland is unpersuasive. Subsections (b)(1) and (b)(2) are focused on a defendant's conduct, not on the residence of the parties to whom such conduct was directed.

17

Subsection (a) of the long-arm statute is satisfied
notwithstanding the fact that Plaintiffs allege in their claim that
GITI USA sold tires to former Orteck customers in Maryland as well
as in other states. The "concept of a cause of action" in
subsection (a) "should be broadly construed to cover an entire
transaction so that, when possible, the entire dispute may be
settled in a single litigation." *Malinow v. Eberly*, 322 F.Supp.
594, 599 (D.Md. 1971) (internal quotation marks omitted). It is
not required that "all the elements of a cause of action be founded
on acts which have taken place within the State of Maryland . . .
so long as there is a showing of some purposeful acts performed by
the defendant in Maryland in relation to one or more of the
elements of the cause of action." *Id.* at 146; *see also Talagen
Corp. v. Signet Leasing & Fin. Corp.*, 104 Md.App. 663, 670 n.3
(1995). In *Snyder*, the court explained that its exercise of
specific jurisdiction satisfied subsection (a) where the plaintiff
brought a breach of contract claim that arose from "contracts with
Maryland customers, as well as customers in other states," when
"significant elements of the plaintiffs' claim" arose of the
defendant's contact with Maryland. 521 F.Supp. at 146. Thus,
subsection (a) "merely prevents the assertion of claims in the
forum state that do not bear some relationship to the acts in the
forum state relied upon to confer jurisdiction." *Malinow*, 322
F.Supp. at 599.

18

Plaintiffs' claim against GITI USA involves GITI USA's tire sales to former Orteck customers.  The claim arises out of contact with Maryland because Plaintiffs' claim is based, in part, on GITI USA's sale of tires to the Maryland location of a former Orteck customer, ATD.   Thus, as in *Snyder*, 521 F.Supp. at 146, "significant elements" of Plaintiffs' claim arise out the contact with Maryland.   Furthermore, the operative facts regarding the remainder of this claim, i.e., tires sales to other Orteck customers, bear a strong relationship to the sale of tires in Maryland on which jurisdiction is based so as to constitute one "cause of action" under subsection (a).   Accordingly, subsection (a) of the long-arm statute is satisfied.

Because specific jurisdiction is proper under subsections (b)(1) and (b)(2), the parties' arguments relating to general jurisdiction need not be addressed.

## 2.   Due Process

The pertinent question is whether the defendant purposefully established "minimum contacts" with Maryland such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). The crucial issue is whether the defendant's contacts with the forum state are substantial enough that the defendant "should reasonably anticipate being haled into court there." *World-Wide*

*Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).   To determine whether an exercise of specific jurisdiction under subsection (b)(1) or (b)(2) of the Maryland long-arm statute satisfies due process, the court must consider: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities within the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Md.*, 334 F.3d at 397.

The first factor, purposeful availment, is satisfied where a nonresident defendant purposefully has engaged in significant activities within the forum state or has created "continuing obligations" with residents of the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).   In this situation, the defendant has obtained the benefits and privileges of conducting business in the forum and, thus, "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.*   In determining whether purposeful availment is satisfied by a nonresident defendant's act of contracting with a party in the forum, courts focus on the parties' "prior negotiations," the "contemplated future consequences" of the contract, "the terms of the contract," and "the parties' actual course of dealing." *Id.* at 479.

20

Plaintiffs proffer facts supporting a prima facie finding that GITI USA purposefully engaged in business with a former Orteck customer, ATD, before the complaint arose by selling tires to be shipped to ATD's Maryland location.[19]  In addition, the August 19, 2005, order acknowledgment implies that there were "prior negotiations" between the parties before the order was placed. *Burger King*, 471 U.S. at 479.  Further, the documents produced during discovery reveal that the future consequence of the August 19, 2005, order acknowledgment was the shipment, made on December 3, 2005, of 32,868 pounds of tires, worth a total of $46,733, to ATD's facility in Landover, Maryland.  (Paper 51, ex. C, GITI USA 000003-000005).   Such contacts demonstrate that GITI USA purposefully transacted business in Maryland and contracted to supply goods to Maryland in such a manner so as to make it reasonable to require GITI USA to defend itself here.

Even a single contact with the forum state can constitute purposeful availment sufficient to satisfy due process requirements.  *Burger King*, 471 U.S. at 475 n.18 ("So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction.").  Thus, the United States Court of Appeals for the Fourth Circuit has held that a single contact may

---

[19] In fact, the list of former Orteck customers at the center of Plaintiffs' claims is contained in an e-mail which was sent to, among others, Mr. DeIorio, formerly of TransPacific and currently Executive Vice President of Sales and Marketing at GITI USA. (Paper 5, ex. F).

be sufficient to satisfy purposeful availment even in cases where the single contact involved even fewer goods than those in the instant case.  For instance, in a case arising out of the shipment of a single parachute into South Carolina, the Fourth Circuit held that a "single transaction is a sufficient contact to satisfy [due process] if it gives rise to the liability asserted in the suit." *Hardy v. Pioneer Parachute Co.*, 531 F.2d 193, 195 (4th Cir. 1976). In another case, the court concluded that exercising personal jurisdiction over a defendant who made a one-time shipment of $37,000 worth of window frames to the forum state, or what the court called "a rather solitary and fleeting contact," was consistent with due process.  *Ajax Realty Corp. v. J.F. Zook, Inc.*, 493 F.2d 818, 822 (4th Cir. 1972) ("[T]he day is long past when the 'minimal contact' necessary to satisfy due process is to be equated with the traditional concept of doing business."), *cert. denied sub nom. Durell Prods., Inc. v. Ajax Realty Corp.*, 411 U.S. 966 (1973).

Moreover, GITI USA's Maryland contact with a former Orteck customer is more than an "attenuated" affiliation with Maryland. *Burger King*, 471 U.S. at 475 n.18.  The discovery documents, which include order acknowledgments, invoices, packing slips, and bills of lading related to the Maryland transaction with ATD, reveal multiple steps and ongoing interaction in GITI USA's contact with Maryland, demonstrating a continuing relationship with ATD that

22

extends beyond an isolated, one-time transaction.[20]  Finally, GITI USA's continuing relationship with a former Orteck customer in Maryland is further shown by the fact that it continued to pursue a business relationship with ATD after the date of the complaint.[21]

The second factor of the due process test is satisfied because, as noted above with respect to the Maryland long-arm statute, Plaintiffs' complaint arises out of GITI USA's activities directed at Maryland, alleged GITI USA tire sales to former Orteck customers in Maryland.  Plaintiffs' entire cause of action need not arise out of GITI USA's contacts with Maryland to satisfy due process.  Once a court has before it a "constitutional case, in the Article III sense," the assertion of "personal jurisdiction over a defendant by any authorized mechanism consistent with due process may be held to apply to the entire constitutional case."  *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 628-29 (4th Cir. 1997)

---

[20] Among the documents produced in discovery is an e-mail, dated December 30, 2005, sent by GITI USA's customer service manager, Eva Cardenas, to an individual at ATD, explaining: "Pat, it has been a great pleasure working with you in 05 and I am looking forward to a [*sic*] continue working with you and the other ATD staff in 06."  (Paper 51, ex. F, GITIUSA 001511).

[21] In addition to the GITI USA e-mail expressing interest in pursuing ATD business in 2006, the discovery materials produced by GITI USA include a December 21, 2005, e-mail from a GITI USA employee describing ATD as among "the big [GITI USA] customer group," (paper 51, ex. F, GITIUSA 000832), and additional e-mails, all dated December 2005 to January 2006, discussing ATD business or communicating directly with ATD employees.  (Paper 51, ex. F, GITIUSA 001499-001510).

(finding pendent personal jurisdiction appropriate where claims
share the same "factual nucleus").

The factual nucleus of this case concerns GITI USA's tire
sales to former Orteck customers.  Specific personal jurisdiction,
consistent with due process, is authorized over GITI USA with
respect to its tire sales to former Orteck customers in Maryland,
and personal jurisdiction is proper with respect to any part of
Plaintiffs' claim constituting the same constitutional case.  The
portion of Plaintiffs' claim based on GITI USA's sales to former
Orteck customers outside of Maryland shares a factual nucleus with
the portion of the claim based on GITI USA's tire sale in Maryland.

Third, personal jurisdiction is constitutionally reasonable.
The factors the court considers in making this determination are
"the burden on the defendant, the forum State's interest in
adjudicating the dispute, the plaintiff's interest in obtaining
convenient and effective relief, the interstate judicial system's
interest in obtaining the most efficient resolution of
controversies, and the shared interest of the several States in
furthering fundamental substantive social policies." *Burger King*,
471 U.S. at 477 (internal quotations marks omitted).  "These
considerations sometimes serve to establish the reasonableness of
jurisdiction upon a lesser showing of minimum contacts than would
otherwise be required." *Id.*

Three of these factors are relevant in the instant case.  Any
burden placed on GITI USA by defending in this forum is lessened

considerably by the fact that it is represented in this action by the same counsel currently representing GT China, and Brian Chan. In addition, Plaintiffs' interest in obtaining convenient and effective relief, as well as the interstate judicial system's interest in efficiently resolving this controversy, is best satisfied by this court's exercise of personal jurisdiction.  The United States District Court for the Central District of California transferred a companion case to this action, *TransPacific Tire & Wheel, Inc. v. Orteck International, Inc., et al.*, Civil Action No. DKC 2006-0187, here in March 2006.  (Paper 43).  Both cases regarding the events in question are pending presently in this court, leaving this forum the one most likely to resolve the dispute efficiently.

Plaintiffs have made the required prima facie showing of personal jurisdiction.[22]  Accordingly, GITI USA's motion to dismiss for lack of personal jurisdiction will be denied.

**III.  Motion to Dismiss pursuant to Rules 12(b)(6) and 9(b)**

**A.  Standard of Review**

**1.  Rule 12(b)(6)**

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

---

[22] Because Plaintiffs have made this prima facie showing, Plaintiffs' other arguments in support of this court exercising personal jurisdiction over GITI USA need not be addressed.

Accordingly, a Rule 12(b)(6) motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993), *cert. denied*, *Am. Home Prods. Corp. v. Mylan Labs., Inc.*, 510 U.S. 1197 (1994)).  The court must disregard the contrary allegations of the opposing party.  *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969).  The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## 2. Rule 9(b)

Fed.R.Civ.P. 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  The word circumstances "is interpreted to include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'"  *Superior Bank, F.S.B. v. Tandem Nat'l Mortgage, Inc.*, 197 F.Supp.2d 298, 313-14 (D.Md. 2000) (quoting *Windsor Assocs. v. Greenfeld*, 564 F.Supp. 273, 280 (D.Md. 1983)).  "The purpose of this rule is to provide the defendant fair notice of the basis of plaintiff's claim and to protect defendant's reputation from groundless accusation of fraud incited by the possibility of an *in terrorem* increment in the settlement value of a lawsuit."  *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F.Supp.2d 785, 798 (D.Md. 2002)(internal quotation marks omitted).

## B. Count I, Fraud (GT China, TransPacific, and Mr. Chan)

Plaintiffs allege fraud with regard to: (1) the alleged exclusive distributorship agreement and request for the customer list, and (2) the warehouse agreement.  Plaintiffs first assert that GT China, TransPacific, and Mr. Chan falsely represented the reasons they wanted Orteck's customer list and that they would not sell tires to Orteck's customers; they knew their representations

were false, and made the statements in an attempt to defraud
Orteck.    Plaintiffs   maintain   that   Orteck   relied   on   the
misrepresentations and would not have shared the customer list
without a guarantee that its customers would not be solicited.  As
a result of the misrepresentations, Plaintiffs state that Orteck
suffered damage.

Plaintiffs  assert  that  GT China, TransPacific, and Mr. Chan
falsely represented to Plaintiffs that TransPacific would pay half
of the expenses associated with the warehouse and that TransPacific
would  lease  the  warehouse  from  Orteck;  they  knew  that  the
statements  were  false, and  made  them  in  an  attempt  to  defraud
Plaintiffs.  Plaintiffs relied on the misrepresentations and, as a
result, were damaged.

Defendants argue that Plaintiffs fail to state a fraud claim
because they do not allege an actionable misrepresentation and they
do not plead their claims with the particularity that Fed.R.Civ.P.
9(b) requires.

The Court of Appeals of Maryland recently recited the elements
of a fraud claim under Maryland law:

> To prove an action for civil fraud based on
> affirmative misrepresentation, the plaintiff
> must show that (1) the defendant made a false
> representation  to  the  plaintiff,  (2)  the
> falsity of the representation was either known
> to  the  defendant  or  the  representation  was
> made with reckless indifference to its truth,
> (3)  the  misrepresentation  was  made  for  the
> purpose  of  defrauding  the  plaintiff,  (4)  the
> plaintiff relied on the misrepresentation and

> had the right to rely on it, and (5) the
> plaintiff suffered compensable injury as a
> result of the misrepresentation.[23]

*Hoffman v. Stamper*, 385 Md. 1, 28 (2005).

Defendants are incorrect in their assertions that a misrepresentation of future intent about the customer list cannot provide the basis for a fraud claim.

> It is true, as a general rule, that an action
> for fraud will lie only for misrepresentation
> of past or existing facts, and that breach of
> a promise to render a performance in the
> future is redressable only by an action in
> contract. *See*, *e.g.*, [*Call Carl, Inc. v. BP
> Oil Corp.*, 554 F.2d 623,] 631 [(4th Cir. 1977),
> *cert. denied*, 434 U.S. 923 (1977)]; *Delmarva
> Drilling Co. v. Tuckahoe Shopping Center,
> Inc.*, 268 Md. 417, 302 A.2d 37, 41-42 (1973);
> *Appel v. Hupfield*, 198 Md. 374, 84 A.2d 94, 96
> (1951). It is also settled law in Maryland,
> however, that "[a] promissory representation
> made with an existing intention not to perform
> is actionable for fraud." *Sims v. Ryland
> Group, Inc.*, 37 Md. App. 470, 378 A.2d 1, 2
> (1977). *Accord Levin v. Singer*, 227 Md. 47,
> 175 A.2d 423, 432 (1961).

*Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987). Plaintiffs allege that Defendants made promises

---

[23] Both Plaintiffs and Defendants apply Maryland law in their respective briefs. In a footnote, Defendants state that they "will apply Maryland law for the purposes of this motion only without conceding that Maryland law applies to any or all of Plaintiff's state law claims." (Paper 24, at 17 n.9). Defendants had the opportunity to argue for the application of another state's law and did not; they will not be heard to raise choice of law arguments later, should they disagree with the court's resolution of Plaintiffs' claims. Because neither party has argued that a different state's law should apply, the court will apply Maryland law.

to Orteck regarding the customer list, with no intention of keeping them.  Hence, such misrepresentations can provide the basis for a fraud claim.

Nevertheless, Plaintiffs have not stated a claim with adequate specificity.  In the amended complaint, Plaintiffs allege that sometime in February 2003, Mr. Chan, "at the direction of GT China and TransPacific, asked Orteck to provide its customer list." Plaintiffs claim that Mr. Chan falsely represented that Chan, TransPacific, and GT [China] wanted to use the list "to strengthen the relationship between the companies and to promote better customer satisfaction," knowing that this statement was false. Plaintiffs allege that "Chan, TransPacific, and GT [China] made a false representation that if Orteck would give them a list of customers, they would not sell tires to Orteck's customers" and that "Chan, TransPacific, and GT [China]" knew that the representations were false, and neither intended to nor kept their promise not to sell to Orteck's customers.

Plaintiffs have failed to provide adequate details about the alleged misrepresentations.  Plaintiffs do not state the time or place of the statements, and do not identify the person or people who agreed to keep the customer list confidential and not to sell to Orteck's customers.[24]  *See Superior Bank*, 197 F.Supp.2d at 313-

---

[24] In Count II, Plaintiffs provide some additional detail with regard to alleged fraudulent acts committed in violation of RICO,
(continued...)

14; *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D.Md. 2000) ("A complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud.").

Plaintiffs' claim as to the warehouse deal suffers from the same deficiency - it is not pled with adequate specificity. Plaintiffs assert that Mr. Hoesada of TransPacific met with Orteck in Maryland and proposed to establish a warehouse, and that sometime in April 2004, "TransPacific and Orteck finalized the agreement" regarding the warehouse.  Plaintiffs state that the agreement provided that Orteck and TransPacific would split evenly all of the expenses associated with the warehouse and that TransPacific breached the agreement by not paying its share of the expenses.  Additionally, Plaintiffs claim that Mr. Hoesada later proposed that, if Orteck purchased the warehouse, TransPacific would lease it from Orteck.  Plaintiffs claim that TransPacific later "intentionally breached" this agreement.

---

[24](...continued)
and in some cases identify the date of specific communications. Plaintiffs do not, however, specify whether and to what extent these communications are also applicable to Count I, the fraud claim, or Count V, the negligent misrepresentation claim.  Neither the court nor Defendants should be left to guess which communications are applicable to which claim.  *See* Fed.R.Civ.P. 8(a) (requiring a "short and plain statement of the claim showing that the pleader is entitled to relief").  Moreover, the detail that is provided in Count II generally is insufficient.  See discussion *infra*, pp. 37-38.

Plaintiffs do not allege specific facts relating to the alleged warehouse fraud.  Their claim is in essence, an assertion that TransPacific failed to honor the warehouse agreements. However, "[f]ailure to perform a contract does not convert a breach of contract into fraud." *Kwang Dong Pharm. Co. v. Han*, 205 F.Supp.2d 489, 495 (D.Md. 2002) (applying Maryland law).  Hence, to the extent that Plaintiffs make only general allegations that TransPacific breached the warehouse agreement, Plaintiffs' claim is properly characterized as one for breach of contract.  *See Kwang Dong Pharm. Co.*, 205 F.Supp.2d at 495 (finding that an allegation that fraudulent contracts were only a part of a fraudulent scheme was not sufficient to transform a breach of contract claim into fraud).  Moreover, based on Plaintiffs' allegations, it is unclear what role, if any, Mr. Chan and GT China may have played in the alleged warehouse fraud.

Accordingly, the court will grant the motion to dismiss Plaintiffs' fraud claim, but will give Plaintiffs leave to amend the complaint to plead the fraud claim with adequate specificity.

## C.  Counts II-IV, RICO Claims (All Defendants)

### 1.  Plaintiffs' Claims and Defendant's Arguments

Plaintiffs assert three claims for racketeering pursuant to RICO's civil provision, 18 U.S.C. § 1964, which provides a cause of action to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."  Plaintiffs allege

that all Defendants were involved in a pattern of racketeering activity and violated §§ 1962(a), (c), and (d).[25]

## a. Used or Invested Funds from a Pattern of Racketeering Activity (§ 1962(a))

Plaintiffs allege that all Defendants received income derived from a pattern of racketeering activity, including but not limited to acts in violation of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises). Plaintiffs claim that Defendants GT China, TransPacific, and Mr. Chan, "used or invested such [racketeering] income, or its proceeds in the acquisition of an interest in, the establishment or

---

[25]  In relevant part, Title 18, § 1962 provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

operation of TransPacific and GITI USA, which are engaged in interstate commerce."[26]

## b. Conducted an Enterprise Through a Pattern of Racketeering Activity (§ 1962(c))

Plaintiffs allege that Mr. Chan is employed by or associated with GT China, TransPacific, GITI USA, and Global Tire & Wheel, Inc., and that these entities engage in activities affecting interstate or foreign commerce.  Likewise, Plaintiffs allege that GT China is employed by or associated with TransPacific and GITI USA, and that TransPacific is employed by or associated with GITI USA.  Plaintiffs claim that GT China, TransPacific, and Mr. Chan, "conduct[] or participate[], directly, or indirectly, in the conduct of the affairs of the enterprises GT [China], TransPacific, GITI USA, [and/or] Global Tire & Wheel, Inc., through a pattern of racketeering activity, . . . including, but not limited to acts in violation of sections 1341 [(mail fraud)], 1343 [(wire fraud)], 1951 [(interference with commerce by threats or violence)], and 1952 [(interstate and foreign travel or transportation in aid of racketeering enterprises)] of title 18 of the United States Code."[27]

---

[26] Plaintiffs additionally allege that Mr. Chan used or invested the income in Global Tire & Wheel, Inc., a new company formed by Chan.  It is not exactly clear if or how Global Tire Wheel, Inc. is related to GT China, TransPacific, or GITI USA.

[27] Plaintiffs allege that Mr. Chan conducts or participates in the conduct of the affairs of all four enterprises; GT China conducts or participates in the conduct of the affairs of GT China and TransPacific; and TransPacific conducts or participates in the conduct of the affairs of GITI USA.

### c.  Conspired to violate §§ 1962(a) and (c) (§ 1962(d))

Plaintiffs allege that Defendants GT China, TransPacific, and Mr. Chan conspired to violate 18 U.S.C. §§ 1962(a) and (c). Plaintiffs state that they are persons as defined under 18 U.S.C. § 1961(3) and § 1964(c), and have suffered injury.

### d.  Alleged Racketeering Activity

Plaintiffs describe the alleged racketeering activity, which provides the basis for all of their RICO claims, as follows.

First, Plaintiffs claim that GT China and TransPacific, committing mail fraud (§ 1341), "devised a scheme to obtain the Customer List by means of false or fraudulent pretenses, misrepresentations and false promises, and attempted to execute or executed such scheme by use of the post office or private or commercial interstate carrier." (Paper 3, at 15).  In support of this allegation, Plaintiffs state that TransPacific and GT China shipped goods to Orteck using commercial interstate carriers, and cite two letters sent by TransPacific to Orteck during April and May of 2005.

Second, Plaintiffs allege that all Defendants committed wire fraud (§ 1343) by communicating via wire that:

> - Orteck would be the exclusive distributor of Kaiyuan truck tires and Primewell brand GT tires in the United States;
>
> - TransPacific was GT China's North American representative;
>
> - GT China, TransPacific, and Mr. Chan would not interfere with or sell to Orteck customers;

- Defendants would not help Orteck after GT China failed to supply Primewell tires to Orteck's customers;

- Orteck should sign a distribution agreement concerning the products shipped to the Maryland warehouse;

- Orteck should prepare the Maryland warehouse for shipments from Defendants;

- Orteck should send information and pictures regarding the warehouse; and

- TransPacific had a new opportunity for Orteck to sell certain tires in the northeastern United states.[28]

(Paper 3, at 16-18).  Plaintiffs also cite phone calls from 2001 through 2005, by GT China, TransPacific, and Mr. Chan, in which Defendants made promises not to sell to Orteck's exclusive customers and statements concerning the warehouse.

Third, Plaintiffs allege that acts of interstate and foreign travel or transportation in aid of racketeering enterprises (§ 1952) occurred when "Chan and representatives of GT [China] and TransPacific traveled to Orteck's offices in Gaithersburg, Maryland on multiple occasions from 2001 to 2004 to promote, facilitate, establish and carry on their unlawful scheme to take Orteck's

---

[28] Plaintiffs provide a date for each alleged fraudulent communication.  Although Plaintiffs specify a particular speaker for some of the alleged communications, for other communications Plaintiffs state that the speaker was GT China, TransPacific, and Brian Chan.

Customer list, to eliminate Orteck as a[n] exclusive, wholesale distributor of GT brand tire products."[29]

Defendants address Plaintiffs' RICO claims collectively, and maintain that all of the claims should be dismissed because: (1) Plaintiffs fail to plead properly a predicate act because the actions alleged to satisfy § 1952 (acts of interstate and foreign travel or transportation in aid of racketeering enterprises) do not, as a matter of law, constitute "unlawful activity" and because the mail (§ 1341) and wire fraud (§ 1343) claims are not pled with sufficient particularity; (2) Plaintiffs fail to establish a pattern of racketeering because the alleged predicate acts are not continuous; (3) Plaintiffs fail to allege an enterprise separate from a RICO Defendant; and (4) Plaintiffs' RICO conspiracy claim fails as a matter of law because neither of the substantive RICO claims (§§ 1962(a) and (c)) is viable and because Plaintiffs allege that Defendants comprise the same entity.

## 2.  Analysis

In order to succeed on any of their RICO claims, Plaintiffs must show that Defendants were involved in a pattern of racketeering activity.

## a.  Racketeering Activity

Racketeering activity is defined under 18 U.S.C. § 1961(1), and includes, among other things, violations of 18 U.S.C. §§ 1341

---

[29] Plaintiffs do not make any specific allegations concerning the alleged violation of § 1951.

(mail fraud), 1343 (wire fraud), 1951 (interference with commerce by threats or violence), and 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), the sections that Plaintiffs cite in support of their claims.   However, Plaintiffs do not adequately plead racketeering activity with respect to any Defendant.[30]

First, Plaintiffs fail to allege facts sufficient to show that either § 1951 or § 1952 is applicable.   Section 1951 states:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).   Plaintiffs do not allege, in either their amended complaint or opposition memorandum, that any Defendant committed acts amounting to robbery or extortion, or conspired to

---

[30] The court notes at the outset that although Plaintiffs state that they assert RICO claims against GITI USA, they do not make any allegations that GITI USA specifically violated § 1962.   Although Plaintiffs allege that GT China, TransPacific, and Mr. Chan used or invested money derived from racketeering activity in their acquisition of an interest in GITI USA, they do not allege that GITI USA itself used or invested racketeering money in violation of § 1962(a).   Moreover, Plaintiffs do not assert that GITI USA conducted the affairs of an enterprise through a pattern of racketeering activity (§ 1962(c)), or conspired to violate § 1962 (§ 1962(d)).   Accordingly, Plaintiffs' RICO claims against GITI USA will be dismissed.   *See* 18 U.S.C. § 1964; *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-66 (1992) (noting that a plaintiff must show the defendant violated § 1962, in order to recover on a RICO claim).

commit such acts.  Plaintiffs also do not allege that any Defendant committed or threatened to commit acts of physical violence.

Section 1952 prohibits travel in interstate or foreign commerce to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity.[31]  18 U.S.C. § 1952(a)(3).  "Unlawful activity" is narrowly defined to include: (1) any business enterprise involved in gambling, liquor, narcotics, controlled substances, or prostitution; (2) extortion, bribery, or arson; and (3) money laundering, engaging in monetary transactions in property derived from specified unlawful activity, and acts indictable under subchapter II of chapter 53 of title 31 of the United States Code, dealing with records and reports on monetary instruments and transactions.  Plaintiffs do not allege, in either their amended complaint or in their opposition memorandum, that Defendants' purported activities are unlawful as defined under § 1952.  Accordingly, Plaintiffs fail to plead properly a predicate act pursuant to either § 1951 or § 1952.

---

[31] Although Plaintiffs do not specify which section of § 1952 they allege Defendants violated, Plaintiffs state that Defendants traveled to Orteck's offices "to promote, facilitate, establish and carry on their unlawful scheme," which closely replicates the language of § 1952(a)(3).  The other two sections of § 1952(a) do not appear to be applicable.  *See* § 1952(a)(1) (prohibiting the distribution of proceeds from an unlawful activity) and § 1952(a)(2) (prohibiting any crime of violence to further any unlawful activity).

Second, Plaintiffs' allegations of racketeering through mail and wire fraud pursuant to §§ 1341 and 1343, respectively, generally are insufficient. The overwhelming majority of Plaintiffs' claims are not pled with adequate particularity and fail to allege that a misrepresentation caused Plaintiffs' injury or that Plaintiffs' reliance on the misrepresentations was justified. *See Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991, 1996-99 (2006) (emphasizing that a defendant's violation must be both a factual and proximate cause of the plaintiff's injury, and stating that "[t]he proximate-cause inquiry . . . requires careful consideration of the relation between the injury asserted and the injurious conduct alleged) (internal quotation marks and citation omitted); *Chisolm v. Transouth Fin. Corp.*, 95 F.3d 331, 336-38 (4th Cir. 1996) (noting the requirement in 18 U.S.C. § 1964(c) that a person be injured "by reason of" a § 1962 violation; interpreting "by reason of" to include factual and proximate causation; and stating that where fraud is asserted as a proximate cause of the plaintiff's injury, the plaintiff must have justifiably relied to his detriment on the defendant's misrepresentation).

Like common law fraud claims, RICO claims based on mail and wire fraud are also subject to Fed.R.Civ.P. 9(b). *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001). At a minimum, Plaintiffs must identify the time, place, contents, and speaker of the alleged misrepresentation, along with

what was obtained by the statement.  *See Superior Bank,* 197 F.Supp.2d at 313-14; *Adams*, 193 F.R.D. at 250.

In support of their claim for mail fraud, Plaintiffs cite two letters, dated April 25, 2005, and May 23, 2005, and state that goods were shipped from TransPacific and GT to Orteck via interstate commercial carriers.  Plaintiffs do not specify how the shipment of goods constituted fraud or caused Plaintiffs' injury, or otherwise provide any details about the time and place of any particular shipment.  Plaintiffs' amended complaint does not specify the content of the letters, the alleged misrepresentation contained in the letters, who sent the letters, or what any of the Defendants obtained by making the alleged misrepresentations in the letters.  In the opposition memorandum, Plaintiffs explain that Mr. Chan and TransPacific sent the April and May letters, which were invoices to Orteck for tires allegedly shipped.  Plaintiffs state that "Orteck believes that the tires that were the subject of the invoice were untimely or improperly shipped, or not ordered at all." (Paper 37, at 12).  This explanation is insufficient.  Plaintiffs do not articulate the speaker of the misrepresentation, or what was obtained through making the misrepresentation.  Moreover, it is unclear how invoices sent in 2005 relate to the misappropriation of Orteck's customer list, which appears to be the overall basis for Plaintiffs' § 1341 claim. (Paper 3, at 15).

41

Finally, Plaintiffs do not state how these letters caused them harm.

Plaintiffs provide more detail with regard to the alleged wire fraud, and cite sixteen separate communications that Plaintiffs maintain were fraudulent. (Paper 3, at 16-17). However, with the arguable exception of one of the allegations involving a communication dated February 1, 2002, in which YC Chong of GT China allegedly falsely represented that Orteck would handle the Primewell brand in the United States, Plaintiffs still fail to provide adequate detail. Plaintiffs must identify specifically the speaker of the alleged misrepresentation, the contents of the statement, and what the Defendants gained from making the statement. In addition, Plaintiffs must allege that the misrepresentation caused them harm, and that any reliance on the misrepresentations was justified.

**b. Pattern of Racketeering Activity**

Moreover, even if Plaintiffs had adequately pled predicate acts of racketeering, their RICO claims are still deficient because Plaintiffs do not allege facts sufficient to show a *pattern* of racketeering activity. A *pattern* of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To

prove a pattern, a plaintiff is required to show that the predicate
acts are (1) related and (2) that "they amount to or pose a threat
of continued criminal activity." *H.J. Inc. v. Northwestern Bell
Tel. Co.*, 492 U.S. 229, 339 (1989). Acts are related if they "have
the same or similar purposes, results, participants, victims, or
methods of commission, or otherwise are interrelated by
distinguishing characteristics and are not isolated events. *Id*. at
239-40. The Fourth Circuit has provided some guidance on the
continuity element:

> Continuity . . . refers "either to a closed
> period of *repeated* conduct, or to past conduct
> that by its nature projects into the future
> with a threat of *repetition*." [*H.J. Inc.*, 492
> U.S. at 242] (emphasis added). To satisfy the
> continuity element, a plaintiff must show that
> "the predicates themselves amount to, or . . .
> otherwise constitute a threat of, *continuing*
> racketeering activity." *Id*. at [240]
> (emphasis in original). Significantly,
> "[p]redicate acts extending over a few weeks
> or months and threatening no future criminal
> conduct do not satisfy this requirement:
> Congress was concerned in RICO with long-term
> criminal conduct." *Id*. at [242]. . . . Thus,
> predicate acts must be part of a prolonged
> criminal endeavor.

*Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683-84 (4th Cir. 1989).

The Fourth Circuit has interpreted the pattern requirement
strictly. In *Menasco*, the court noted:

> The pattern requirement in § 1961(5) thus acts
> to ensure that RICO's extraordinary remedy
> does not threaten the ordinary run of
> commercial transactions; that treble damage
> suits are not brought against isolated
> offenders for their harassment and settlement

> value; and that the multiple state and federal
> laws bearing on transactions such as this one
> are not eclipsed or preempted.

*Menasco*, 886 F.2d at 683.  The court in *Menasco* held that the fraud

at issue in that case did not satisfy the pattern requirement where

there was a limited purpose to defraud two parties, there was one

perpetrator, and the alleged acts took place over the course of one

year.  *Id*. at 684.  The court concluded:

> Clearly, these acts do not constitute "ongoing
> unlawful    activities    whose    scope    and
> persistence pose a special threat to social
> well-being." [*Int'l Data Bank Ltd. v.*] *Zepkin*,
> 812 F.2d [149,] at 155 [(4th Cir. 1987)]. . .
> .  If the pattern requirement has any force
> whatsoever, it is to prevent this type of
> ordinary    commercial    fraud    from    being
> transformed into a federal RICO claim. . . .
> If we were to recognize a RICO claim based on
> the narrow fraud alleged here, the pattern
> requirement would be rendered meaningless.

*Menasco*, 886 F.2d at 684-85.

Moreover, the Fourth Circuit has used special caution when the

alleged racketeering acts are mail and wire fraud:

> We are cautious about basing a RICO claim on
> predicate acts of mail and wire fraud because
> it will be the unusual fraud that does not
> enlist the mails and wires in its service at
> least twice. . . .  This caution is designed
> to preserve a distinction between ordinary or
> garden-variety fraud claims better prosecuted
> under state law and cases involving a more
> serious scope of activity.

*Al-Abood v. El-Shamari*, 217 F.3d 225, 238-39 (4th Cir. 2000)

(internal quotation marks and citations omitted) (concluding that

"RICO treatment" was not appropriate where the main predicate acts

44

were mail and wire fraud that involved one victim, even though there were three discrete schemes spanning several years).  *See also Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998) (holding that the use of telephone and mail services to defraud one party with respect to two properties does not satisfy the continuity element of RICO's pattern requirement).

Plaintiffs base their RICO claim on predicate acts of mail and wire fraud.  The court therefore must be cautious in its analysis.[32] In the amended complaint, the thrust of Plaintiffs' allegations is that Defendants used the mail and wires in a scheme to defraud Orteck of profits and to eliminate Orteck as a competitor. Notwithstanding the fact that the alleged related acts occurred over a period of years, an allegation of mail and wire fraud against one victim, without more, does not satisfy the continuity element as interpreted by the Fourth Circuit.  *See Al-Abood*, 217 F.3d at 238-39; *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 182 (4th Cir. 2002) (quoting *GE Inv.*, 247 F.3d at 549) (noting that where the fraud has a "'built-in ending point,'" the bankruptcy of one corporation, "'the case does not present the necessary threat of long-term, continued criminal activity'").

---

[32] As noted, Plaintiffs do not allege any facts related to a violation of either § 1951 or § 1952.  Thus, the only remaining allegations pertain to mail and wire fraud.

45

In their opposition memorandum, however, Plaintiffs characterize their claim differently. Instead of concentrating on Defendants' scheme to defraud Orteck, Plaintiffs emphasize that "Defendants engaged in a pattern of racketeering activity in order to obtain, through unlawful means, the tire business of Orteck *and other similarly situated companies*, such as Reliable Tire and GTN." (Paper 37, at 13) (emphasis added). Plaintiffs argue that "Defendants victimized the *tire industry* by using the United States mail, private commercial carriers, the telephone and e-mail." (Paper 37, at 13) (emphasis added). Plaintiffs assert that Mr. Chan, TransPacific, and GT China acted with similar purpose, achieved similar results, and used similar methods to defraud Orteck, GTN, and Reliable Tire."[33] Moreover, Plaintiffs state that Defendants "built their business by repeatedly defrauding business partners." Plaintiffs claim that actions by GT China and its agents forced GTN out of business. Plaintiffs state that GT China, through TransPacific and Seyan Trading, refused to fill Reliable Tires' orders for tires, which caused Reliable Tire to be unable to fill its customers orders and resulted in loss to Reliable.

Although similar fraudulent schemes employed against multiple victims by the same defendant may be found to satisfy the related and continuous elements and therefore show a *pattern* of

---

[33] Plaintiffs claim that a GT China affiliate, Seyan Trading, was also involved in the scheme to defraud GTN and Reliable Tire.

racketeering activity, Plaintiffs do not plead the fraud claims involving these other companies with adequate specificity. Plaintiffs claim that Seyan Trading, an alleged affiliate of GT China, sold tires to GTN and Reliable customers, but there is no explanation of why these acts were fraudulent (e.g., Plaintiffs do not maintain that either GTN or Reliable had exclusive distributorship agreements or, if they did, that Seyan's actions constituted anything more than breach of contract).  General and conclusory assertions that Defendants defrauded others through similar acts are insufficient to establish a pattern of racketeering activity.  Plaintiffs must allege specific acts of mail and wire fraud against GTN and Reliable.

Accordingly, Plaintiffs' RICO claims will be dismissed. Plaintiffs will, however, have leave to amend the complaint to state RICO claims, as against GT China, TransPacific, and Mr. Chan. If Plaintiffs choose to amend their complaint to include RICO claims, they must allege a *pattern* of *racketeering activity* with sufficient particularity.[34]

---

[34] Defendants additionally assert that Plaintiffs fail to state a RICO claim because Plaintiffs allege in their complaint that GT China, TransPacific, and GITI USA are the same entity, and there is no allegation of a separate enterprise, which is required for a RICO claim.  However, in GITI USA's motion to dismiss for lack of personal jurisdiction, GITI USA asserts that it is, in fact, a separate entity from GT China and Transpacific.  The relationship between TransPacific and GT China is not entirely clear, based on the current record.  Any argument premised on the notion that the entities are not separate is premature at this procedural juncture.

**D.  Count V, Negligent Misrepresentation (GT China, TransPacific, and Mr. Chan)**

Plaintiffs allege that GT China, TransPacific, and Mr. Chan owed a duty of care to Orteck to refrain from misrepresentations that:

> (1) GT [China], TransPacific, and Chan sought the Customer List and information on Orteck's customers to improve customer quality and strengthen company relations; (2) GT [China], TransPacific, and Chan would not sell tires to customers on Orteck's list; (3) that Orteck would be an exclusive reseller of Primewell, Kaiyuan and Runway brand GT radial truck tires; (4) TransPacific and GT [China] would compensate Orteck for the damage caused by the misappropriation of Orteck's exclusive Customer List and information concerning Orteck's customers; (5) TransPacific and GT [China] would pay half of the expenses of the Maryland Warehouse; and (6) TransPacific and GT [China] would lease the Maryland warehouse if the building was purchased.

(Paper 3, at 21-22). Plaintiffs claim that GT China, TransPacific, and Mr. Chan made the aforementioned statements with the intention of having Orteck rely on them, and that "Chan, GT [China], and TransPacific knew that the Plaintiffs would rely upon and were, in fact, relying upon their misrepresentations and that the Plaintiffs would incur damage." Plaintiffs allege that Orteck justifiably relied on the statements and, as a result, was damaged.

Defendants assert that they did not owe Plaintiffs a duty of care in tort, Plaintiffs fail to allege that any of the Defendants made an actionable misrepresentation, and Plaintiffs fail to allege

the negligent misrepresentation claim with sufficient particularity under Fed.R.Civ.P. 9(b).[35]

Under Maryland law, to assert a claim of negligent misrepresentation, a plaintiff must show:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;(2) the defendant intends that his statement will be acted upon by the plaintiff;(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;(4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 337 (1982).

Where a plaintiff asserts a claim for economic loss due to negligent misrepresentation, "the injured party must prove that the defendant owed him or her a duty of care by demonstrating an intimate nexus between them." *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 12-13 (2000). The intimate nexus may be satisfied by contractual privity or its equivalent. *Jaques v. First Nat'l Bank of Md.*, 307 Md. 527, 534-35 (1986). However, even where a contract exists, the court will look to the nature of the relationship to determine whether a duty in tort, in addition to a contractual duty, arises under the circumstances. *Id*. at 540-41; *see also*

---

[35] Plaintiffs dispute that the heightened pleading standard of Rule 9(b) applies to the negligent misrepresentation claim, but assert that even if the rule does apply, their complaint meets the standard.

*Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 253 (1999) ("A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis."). In *Mesmer*, the court noted that there is no "simple test" for determining when a breach of a contract will also breach an independent tort duty, but provided some guidelines:

> [W]hen the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy. It is when the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the appropriate standard of care, that the plaintiff may, in some circumstances, maintain a tort action.

*Mesmer*, 353 Md. 241 at 254.

As with a fraud claim, predictive statements about future events are not actionable as negligent misrepresentations as a general rule. *See Cooper v. Berkshire Life Ins. Co.*, 148 Md. App. 41, 73 (2002), *cert. denied*, 373 Md. 407 (2003). To the extent that a party making the representation about its future conduct knows at the time the statement is made that it is false, the claim converts to one of *fraudulent* misrepresentation. *Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F.Supp.2d 282, 291 (D.Md. 2003) (applying Maryland law). In *Weisman v. Connors*, 312 Md. 428, 454-56 (1988), the court noted some narrow exceptions

where statements regarding future intentions may be actionable as negligent misrepresentations. The court stated that where a defendant had a high degree of control over the "future action or intention he was 'expecting,'" such a statement could provide the basis for a negligent misrepresentation claim. *Id.* at 454-55. In response to the defendant's argument that he could not negligently misrepresent his own present intention, the court explained that "[i]n the making of representations, the negligence may occur either in obtaining or in communicating the information imparted." *Weisman*, 312 Md. at 456 (internal quotation marks omitted).

The Fourth Circuit has not ruled definitively on whether the heightened pleading standard of Fed.R.Civ.P. 9(b) applies to a negligent misrepresentation claim. However, several district courts within the Fourth Circuit, including the undersigned, have applied Rule 9(b) to such claims. *See Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 351 F.Supp.2d 436, 447 (M.D.N.C. 2005) (holding that even though Rule 9(b) does not expressly refer to the tort of negligent misrepresentation, the rule applies to such claims); *Swedish Civil Aviation Admin.*, 190 F.Supp.2d at 798-99 (evaluating whether fraud and negligent misrepresentation claims met the specificity requirements of Rule 9(b)); *Giannaris v. Cheng*, 219 F.Supp.2d 687, 694 (D.Md. 2002) (quoting Fed.R.Civ.P. 9(b) and stating that "[a]llegations of fraud or misrepresentation must be pleaded 'with particularity'"); *Adams*, 193 F.R.D. at 250 ("The

requirements of Rule 9(b) apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud."); *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 199-202 (M.D.N.C. 1997) (finding that Rule 9(b) is not limited to "willful misrepresentations," applying Rule 9(b) to a negligent misrepresentation claim, and noting that this interpretation is in accord "with the basis behind the rule and its original rationale").  This application also comports with the treatment by Maryland state courts of negligent misrepresentation claims.  *See e.g., Doe v. Doe*, 122 Md.App. 295, 359 (1998), *rev'd on other grounds*, 358 Md. 113 (1998) (finding that like the plaintiff's fraud allegations, the negligent misrepresentation claim was too vague where the plaintiff "did not state with specificity the allegedly false statement" and did not "allege facts supporting reasonable reliance or damages caused by the statement").

Plaintiffs do not plead their claim of negligent misrepresentation with adequate specificity.  Instead, they provide a list of statements that they allege GT China, TransPacific, and Mr. Chan, or some combination of those parties, made.[36]  In

---

[36] In their opposition memorandum, Plaintiffs attempt to identify the speaker of five of the six negligent misrepresentations alleged in the amended complaint, although they designate "TransPacific" as the speaker of three of the statements. (Paper 37, at 21-22).  Plaintiffs also offer slightly altered versions of the alleged misrepresentations, which eliminate any
(continued...)

addition, Plaintiffs do not allege the time and place of the statements. Moreover, although Plaintiffs assert summarily that they "relied" on the alleged misrepresentations, they do not, for each alleged misrepresentation, set forth facts showing such reliance.

Accordingly, the court will grant the motion to dismiss the negligent misrepresentation claim, but will allow Plaintiffs leave to amend the complaint to state the claim with adequate specificity. If Plaintiffs choose to amend the claim, they should be mindful of the court's discussion of the duty element, as well as the type of statements that may be actionable as negligent misrepresentations.[37]

**E.  Count VI, Breach of Contract (GT China and TransPacific)**

Plaintiffs first claim that GT China and TransPacific breached the alleged exclusive distributorship agreement between GT China and Orteck by selling tires directly to Orteck's customers. Plaintiffs also maintain that GT China and TransPacific breached the alleged warehouse agreement by failing to pay half of the

_____

[36](...continued)
reference to GT China. These "clarifications" do not completely resolve Plaintiffs' pleading deficiencies.

[37] The general and conclusory nature of Plaintiffs' allegations prevent the court from making a definitive ruling on these elements at this juncture. The court will defer its ruling until Plaintiffs' claims are pled with adequate specificity.

expenses of the warehouse, and by refusing to lease the warehouse from Plaintiffs after Plaintiffs purchased the warehouse.

Defendants assert that Plaintiffs' breach of contract claim regarding the purported exclusive distributorship agreement fails because Plaintiffs have not alleged the existence of a writing that satisfies the statute of frauds, and the communications alleged by Plaintiffs do not satisfy the "merchant's exception" to the statute of frauds.[38]

Plaintiffs offer several arguments in response.  Plaintiffs assert:

> It is premature for the Court to decide whether the U.C.C., the general statute of frauds, [Md. Code Ann., Cts. & Jud. Proc. § 5-901,] or any statute of frauds applies in this case.  Clearly, writings exist between the parties and additional writings are very likely to be uncovered during discovery.  If the statute of frauds applies at all, exceptions to the statute of frauds would also need to be considered.  For example, an admission in any of the Defendants' records that a contract was formed may make a contract enforceable, even if the statute of frauds applies.

(Paper 37, at 26-27).[39]  Plaintiffs also argue that "it appears that the doctrines of promissory estoppel and part performance would

---

[38] Defendants do not challenge the breach of contract claim based on the purported warehouse agreement.

[39] It is unclear why additional discovery would aid in determining whether or not the statute of frauds is applicable to a distributorship agreement.

take the claim outside of the statute of frauds, if it were to apply at all." *Id.* at 27.

In *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md. App. 379 (1983), *cert. denied*, 295 Md. 736 (1983), the Court of Special Appeals of Maryland specified the applicable law:

> The Maryland Uniform Commercial Code, [Md. Code Ann., Com. Law] § 2-106 . . . defines "contract for sale" to include both a "present sale of goods and a contract to sell goods at a future time." It follows therefrom that dealership or distributorship contracts fall within the sales provisions of the U.C.C. *Artman v. International Harvester Co.*, 355 F.Supp. 482, 486 (W.D.Pa. 1973). It also follows that the Article II Statute of Frauds, found at § 2-201, applies to such agreements.

*Cavalier Mobile Homes, Inc.*, 53 Md. at 394. Hence, the alleged exclusive distributorship agreement is governed by Maryland's U.C.C., including the U.C.C.'s statute of frauds.

Defendants have asserted an affirmative defense based on the statute of frauds. As this court previously noted:

> These defenses may be raised in a Rule 12(b)(6) motion when the face of the complaint reveals the defect. . . . In deciding the motion, the court will consider the facts stated in the complaint and the documents referred to in the complaint and relied upon by [the] plaintiff in bringing the action."

*Ives v. Advanced Broadband Solutions, Inc.*, No. Civ.A.DKC 2003-0848, 2004 WL 180043, at *6 (D.Md. Jan. 23, 2004).

Plaintiffs allege in the amended complaint that following a series of meetings held during 2001 and 2002, Orteck contracted

with GT China to be its exclusive wholesale distributor of Kaiyuan, Runway and Primewell tires.  It is not clear, from the face of the amended complaint, that Plaintiffs can prove no set of facts that would entitle them to relief on the breach of contract claim.[40]  *See Conley*, 355 U.S. at 45-46.  Although it appears unlikely that Plaintiff would be able to defend successfully against a statute of frauds defense asserted in a motion for summary judgment, the court is unable, at this procedural juncture, to grant Defendants' motion to dismiss the breach of contract claim regarding the alleged exclusive distributorship agreement.[41]  Accordingly, Defendants' motion to dismiss the breach of contract claim is denied.

## F.  Count VII, Conversion (GT China, TransPacific, and Mr. Chan)

Plaintiffs allege that GT China, TransPacific, and Mr. Chan induced Orteck to give them its customer list and customer information "under the false pretense that GT [China], TransPacific

---

[40] For example, Plaintiffs do not state in the amended complaint that the alleged distributorship was not encompassed in a writing or that no exceptions to the statute of frauds exist. Defendants incorrectly imply that Plaintiffs must plead facts sufficient to withstand the statute of frauds defense, including facts showing that an exception to the statute of frauds applies.

[41] Plaintiffs' speculation that discovery may lead to other documents that show the existence of the contract is misguided at best.  Plaintiffs offer no explanation as to why Orteck would not already possess such documents, nor do they explain the contradiction between their speculative assertions and Mr. Veen's testimony at the preliminary injunction hearing where he stated that outside of the documents Orteck possessed, he did not believe that any other written document discussing the alleged exclusive distributorship agreement existed.  (Paper 35, Tr., at 99-100).

and Chan sought the list to improve customer quality and strengthen the relationships between the companies and that they would not sell tires to Orteck's customers." (Paper 3, at 24).  Plaintiffs claim that "GT [China], TransPacific, and Chan intentionally, without permission or justification, took Orteck's Customer List and information concerning Orteck's customers."  *Id*.  Plaintiffs claim that Defendants' use of the customer list and information "constituted a conversion of Orteck's property, which caused damage to Orteck."  *Id*.

Defendants argue that Plaintiffs fail to state a claim because Maryland law does not recognize a claim for the conversion of intangible property such as customer names and information.

Under Maryland law, a conversion "is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it."  *Allied Inv. Corp. v. Jansen*, 354 Md. 547, 560 (1999) (internal quotation marks omitted).  Although the original common law rule required the plaintiff's property to be tangible in order to state a claim for conversion, "that rule has been modified over time and certain intangible property interests may now be recovered through a conversion claim."  *Id.*  However, the Court of Appeals has limited the expansion of the rule to include only intangible property rights "that are merged or incorporated into a transferable document," e.g., a stock certificate, and has refused

"to cover completely intangible rights." *Id.* at 562.  Moreover, "[c]onversion requires not merely temporary interference with property rights, but the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor." *Yost v. Early*, 87 Md.App. 364, 388 (1991), *cert. denied*, 324 Md. 123 (1991); *see also Home Paramount Pest Control Cos. v. FMC Corp./Agric. Prods. Grp.*, 107 F.Supp.2d 684, 693 (D.Md. 2000) (applying Maryland law).

A customer list and customer information is not the type of intangible information generally thought to "merge" with or be "incorporated" into a transferable document.  *See* Restatement (Second) of Torts § 242, cmt. a (1965) (describing a "merged" intangible property right as one where "the right to immediate possession of a chattel and the power to acquire such possession is represented by a document," the document is "regarded as equivalent to the obligation," and the document is viewed "as representing the title to the chattel or the obligation"); *Allied Inv. Corp*, 354 Md. at 561-62 (citing Restatement (Second) of Torts § 242).  Moreover, even if the court assumed that the customer list and customer information were intangible property interests that could be recovered through a conversion claim, Plaintiffs' claim still fails because Plaintiffs do not allege any facts showing that they were in any way excluded from using the customer list and customer information after Orteck provided it to Defendants.  That is,

Plaintiffs do not claim that the Defendants used the customer list and information "to the complete exclusion" of Orteck, and in fact emphasize that Orteck tried to continue selling to its customers but were rejected.  Accordingly, Plaintiffs conversion claim will be dismissed.  *See Yost*, 87 Md.App. 364, 388 (1991); *Home Paramount Pest Control Cos.*, 107 F.Supp.2d at 693.

## G.  Count VIII, Intentional Interference with Contractual and Business Relations (GT China, TransPacific, and Mr. Chan)

In the amended complaint, Plaintiffs allege that after receiving Orteck's customer list and information, TransPacific began selling tires to Orteck's customers, which tortiously interfered with "Orteck's contracts and business relations," as well as "Orteck's exclusive right to wholesale distribution of the Kaiyuan, Runway, and Primewell brand GT tires."  As a result of the alleged interference, Plaintiffs state that Orteck suffered the loss of all of its GT tire wholesale business.  In Plaintiffs' opposition memorandum, they cite additional acts in support of their claim.  Plaintiffs argue that: (a) TransPacific and Mr. Chan "maliciously fail[ed] to properly fill Orteck's orders for products" making Orteck unable to fill its customers' orders; (b) TransPacific intentionally shipped Orteck products that it did not order and charged Orteck for the products; (c) TransPacific offered to lease the Maryland warehouse if Orteck purchased it and then refused to follow-through on the agreement; (d) TransPacific intentionally drew on an expired letter of credit posted by Orteck;

and (e) TransPacific transferred the business relationships it had acquired by interfering with Orteck's business to GITI USA, making it harder for Orteck to stop tire sales to Orteck's former customers.

Defendants first argue that Plaintiffs are, in essence, attempting to recharacterize "what is, at most, a simple breach of contract action."  Defendants argue that to the extent that Plaintiffs claim that Defendants interfered with Orteck's right to sell certain tire brands exclusively, the right arose out of an alleged agreement between Orteck and GT China and there was no outside third party involved, which is a requirement to state a claim of tortious interference.  Moreover, Defendants state that Plaintiffs do not assert the existence of a single contract between Orteck and any of its customers that Defendants had knowledge of and interfered with.  Defendants also argue that to the extent that Plaintiffs claim that Defendants interfered with economic relationships, Plaintiffs fail to allege facts showing that Defendants engaged in improper or wrongful conduct.

Under Maryland law, the tort of intentional interference with contractual relations has two manifestations:  "The tort . . . is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship."  *Macklin v.*

*Robert Logan Assocs.*, 334 Md. 287, 297 (1994).  The two types of tort actions differ in terms of the amount of interference that is tolerated.  "[W]here a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of the contract are more narrowly restricted.  A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *Natural Design v. Rouse Co.*, 302 Md. 47, 69-70 (1984).  In order to assert a claim where no existing contract exists (i.e., the broader manifestation of the tort), a plaintiff must show: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Natural Design, Inc.*, 302 Md. at 71 (internal quotation marks omitted).

Defendants correctly assert that tortious interference with business relations "arises only out of a relationships between three parties, the parties to a contract or other economic relationship . . . and the interferer." *K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 155 (1989) ("This Court has 'never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract.'"). Thus, several of Plaintiffs' allegations cannot provide a proper

basis for this claim because there is no connection between the alleged act and its interference with a contract or an economic relationship with a third party.  Plaintiffs cannot, for purposes of this claim, rely on allegations that: TransPacific and Mr. Chan breached the warehouse agreement between Orteck and TransPacific; TransPacific intentionally shipped the wrong product and charged Orteck for it; or TransPacific intentionally drew on an expired letter of credit.[42]   To the extent that Plaintiffs argue that Defendants breached the exclusive distributor agreement with the purpose of interfering with Orteck's business relationships with its customers, this allegation may be the basis of a tortious interference claim.  *See K & K Mgmt., Inc.*, 316 Md. at 160-61 (noting that the breach or threatened breach of an agreement may be the instrument selected by the defendant for the purpose of interfering with a contract between the plaintiff and a third party).

Hence, the only remaining allegations are that: GT China, TransPacific, and Mr. Chan interfered with Plaintiffs' economic relationships by [fraudulently][43] obtaining Orteck's customer list, selling to Orteck customers in violation of an exclusive distributorship agreement, and transferring the business

---

[42] Plaintiffs do not allege that any Defendant interfered with a contract between Plaintiffs and another Defendant.

[43] It remains to be seen whether Plaintiffs can plead fraud with specificity.

relationships to GITI USA; and TransPacific and Chan maliciously failed properly to fill Orteck's orders, making Orteck unable to fill its customer orders.  Plaintiffs do not allege that Defendants interfered with existing contracts, but instead assert that they interfered with economic relationships.  Therefore, Plaintiffs must satisfy the test articulated in *Natural Design Inc.*, 302 Md. at 71.

Plaintiffs have stated a claim for intentional interference with business relationships.  Plaintiffs allege intentional and wrongful acts, done for the purpose of eliminating Plaintiff Orteck as a competitor, which resulted in lost sales.  Plaintiffs claim that GT China, TransPacific, and Mr. Chan engaged in an intentional and fraudulent scheme to eliminate Orteck as a competitor, which included obtaining Orteck's customer list and selling to Orteck's customers in violation of an existing agreement, and failing to fill Orteck's orders, which resulted in Orteck not being able to meet its customers' needs.  *See Macklin*, 334 Md. at 301 ("[A] plaintiff may prove that a defendant acted improperly or wrongfully by showing that he or she used . . . injurious falsehood or other fraud, . . . [but] conduct that is quite subtle, nevertheless, can be improper or wrongful.").  Accordingly, Defendants' motion to dismiss this claim will be denied.

## H.  Count X, Promissory Estoppel (TransPacific, GT China, Chan)

Plaintiffs allege that in reliance on GT China's agreement that Orteck would be an exclusive reseller of certain GT tires,

Orteck "worked five years to build from scratch a customer base for GT's tire products that grew to over $25,000,000 in annual Orteck sales."  Plaintiffs claim that in February 2003, GT China and TransPacific obtained Orteck's customer list through Mr. Chan under the false pretense that GT China, TransPacific, and Mr. Chan would help Orteck improve customer quality, and would not sell to Orteck's customers.  After TransPacific and GT China obtained Orteck's customer list, they began selling to Orteck's customers.  Plaintiffs state that "[i]njustice will result if GT [China] and TransPacific are permitted to continue sell [sic] to Orteck's customers in light of the fact that Orteck worked for five years to build and establish customer relationships."

Plaintiffs also allege that TransPacific and GT China agreed to pay half the expenses of the warehouse and agreed to lease the building if Plaintiffs purchased it and then failed to keep both promises.  Plaintiffs state that Orteck incurred cost to outfit the warehouse so that TransPacific and GT China could use it for storage and distribution.  Moreover, Venetian paid $200,000 as a down payment on the warehouse.  Plaintiffs claim that "injustice will result" if GT China and TransPacific are permitted to avoid the promises they made with regard to the warehouse.

Defendants argue that Plaintiffs' promissory estoppel claim should be dismissed because they fail to allege properly the elements of the claim.  Specifically, Defendants argue that

Plaintiffs did not allege that GT China or TransPacific had a reasonable expectation that the alleged promises would induce action on the part of Plaintiffs, nor did Plaintiffs allege that their action was reasonable.

In *Pavel Enterprises v. A.S. Johnson Co.*, 342 Md. 143 (1996), the Maryland Court of Appeals clarified the elements of a promissory estoppel claim:

> 1.  a clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or forbearance by the promisee; and 4. causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters.*, 342 Md. at 166.  "Damages recoverable under a claim of detrimental reliance are carefully circumscribed; the plaintiff may recover only those specific expenditures made in reliance upon the defendant's promise."  *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1078-79 (4th Cir. 1982) (applying Maryland law).

Plaintiffs allege that GT China and TransPacific made promises to them with regard to the distributorship arrangement and the warehouse.  Plaintiffs claim that based on these promises, Plaintiffs acted to their detriment, and that injustice will occur if Defendants are allowed to avoid their promises.  Plaintiffs do not allege either that GT China and TransPacific reasonably expected Plaintiffs to rely on the alleged promises, or that Plaintiffs' reliance was reasonable.  Accordingly, Defendants'

motion to dismiss the promissory estoppel claim will be granted, however the court will allow Plaintiffs leave to amend the complaint.[44]

## I.   Count XIII, Civil Conspiracy (All Defendants)

Plaintiffs allege that all Defendants entered into a civil conspiracy "to defraud Orteck, take its customers, and destroy its ability to compete for sales of GT Tires to wholesale customers." Plaintiffs state:

> In furtherance of this conspiracy, the Defendants: (1) unlawfully converted Orteck's Customer List and information concerning Orteck's customers; (2) misrepresented that they would not sell GT tires to Orteck's customers; (3) misrepresented that they would pay half of the expenses of the Maryland Warehouse and lease the Maryland Warehouse; (5) tortiously interfered [with] Orteck's contracts and business relations; and (6) GT caused GITI USA to continue the sales to Orteck's customers.

(Paper 3, at 31).  Plaintiffs allege they were damaged as a result.

Defendants argue that because Plaintiffs fail to state any viable tort claim, their conspiracy claim must fail also.   In addition, Defendants assert that Plaintiffs fail to allege sufficiently an agreement or understanding among all Defendants. Defendants also maintain that related subsidiaries with a close nexus cannot conspire with one another.   Thus, because Plaintiffs allege that GT China, TransPacific, and GITI USA are the same

---

[44] At this procedural juncture, the court cannot determine, as a matter of law, that Plaintiffs' reliance was not reasonable.

company, Plaintiffs' conspiracy claim must fail. Finally, Defendants argue that the conspiracy allegation against Mr. Chan fails because of the intra-corporate immunity doctrine.

Under Maryland law, a civil conspiracy has been defined as:

> "[A] combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 385 Md. 1, 24, 867 A.2d 276, 290 (2005) (quoting *Green v. Wash. Sub. San. Comm'n*, 259 Md. 26, 221, 269 A.2d 815, 824 (1970)). The plaintiff must prove an unlawful agreement, the commission of an overt act in furtherance of the agreement, and that as a result, the plaintiff suffered actual injury. *Id.* at 25, 867 A.2d at 290. The unlawful agreement is not actionable by itself; rather, the "[t]ort actually lies in the act causing the harm" to the plaintiff. *Id.* Thus, civil conspiracy is not "capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Id.* (internal citations and quotations omitted).

*Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 485 (2006).

Defendants' first argument, that the conspiracy claim must fail because Plaintiffs fail to state a tort claim, is not viable because Plaintiffs have stated at least one tort claim, and may be able to state additional tort claims in an amended complaint. Moreover, Plaintiffs have alleged sufficiently that there was an agreement among the Defendants.[45] *See Daugherty v. Kessler*, 264 Md.

---

[45] Defendants premise their argument on the fact that GITI USA
(continued...)

281, 292 (1972) ("Conspiracy may be shown by inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relation of the parties, their motives and all the surrounding circumstances preceding and attending the culmination of the common design."); *Harrison*, 176 F.3d at 783 (noting that in resolving a motion to dismiss pursuant to Rule 12(b)(6), the court must construe all factual allegations in the light most favorable to the plaintiff).

As noted, the exact relationship between Defendants GT China, TransPacific, and GITI USA is not entirely clear, although it appears that GITI USA may be a separate entity from GT China and TransPacific.  At this juncture, any argument that the entities cannot conspire because they are too closely related cannot provide the basis for dismissal of the conspiracy claim.  Defendants correctly assert, however, that the doctrine of intra-corporate immunity bars Plaintiffs' conspiracy claim against Mr. Chan.  Under the intra-corporate immunity doctrine, there can be no conspiracy between an agent and a principal where the agent acts within the scope of employment.  *See Marmott v. Md. Lumber Co.*, 807 F.2d 1180, 1185 (4th Cir. 1986), *cert. denied*, 482 U.S. 929 (1987); *Fraidin v.*

---

[45](...continued)
was not formed until after the alleged conspiracy began, and thus there could not be an "agreement" to conspire.  However, this fact, alone, does not negate the possibility that the other Defendants agreed to conspire and then formed GITI USA with the purpose of continuing the conspiracy, as Plaintiffs allege.

*Weitzman*, 93 Md.App. 168, 235 (1992), *cert. denied*, 329 Md. 109 (1993).  Plaintiffs do not allege that Mr. Chan was acting beyond the scope of his employment, or that he acted for any personal purpose or had an "independent personal stake." *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997), *cert. denied*, *Gold v. Panalpina, Inc.*, 522 U.S. 810 (1997) (noting that "a well-established exception" exists to the intra-corporate immunity doctrine when the party has "an independent personal stake"). Accordingly, the court will dismiss the civil conspiracy claim with regard to Mr. Chan, but will deny Defendants' motion with regard to the other Defendants.

## IV.  Motion to Seal

GITI USA filed a motion to seal three exhibits attached to its personal jurisdiction reply memorandum pursuant to Local Rule 105.11. (Paper 53).  There is a well-established common-law right to inspect and copy judicial records and documents. *See Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 597 (1978).  If the public's right of access is outweighed by competing interests, however, the trial court may, in its discretion, seal those documents from the public's view. *See In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).  Local Rule 105(11) provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing

69

would not provide sufficient protections.  The
Court will not rule upon the motion until at
least 14 days after it is entered on the
public docket to permit the filing of
objections by interested parties.  Materials
that are the subject of the motion shall
remain temporarily sealed pending a ruling by
the Court.  If the motion is denied, the party
making the filing will be given an opportunity
to withdraw the materials.

GITI USA explains that its motion to seal is made pursuant to paragraph 9 of the joint stipulation and protective order, approved by this court on March 1, 2006, regarding the confidentiality of discovery materials.  (Paper 41).  The materials that GITI USA seeks to seal involve business records, including spreadsheets, order acknowledgments, invoices, and correspondence.  (Paper 52, Exs. 1-3).  GITI USA's motion is unopposed.

GITI USA's motion to seal does not satisfy local Rule 105.11. It does not offer either a proposed reason supported by specific factual representations to justify the sealing or an explanation as to why alternatives to sealing would not provide sufficient protections.[46]  GITI USA's only offered justification for sealing is that the "the Exhibits contain 'Confidential Information' as defined in the Protective Order."  (Paper 53).  This justification is neither specific nor factual as required by Rule 105.11.  The

---

[46] GITI USA says that "alternatives to sealing would not be sufficient" because those alternatives would make otherwise confidential information public.  (Paper 53).  This is not an adequate explanation under Local Rule 105.11 of why alternatives to sealing would be insufficient.

Protective Order referred to by GITI USA merely provides that the parties must move to seal any documents that disclose information designated as "confidential," without any explanation of why that information should be protected.  (Paper 41).

Because GITI USA has failed to comply with Rule 105.11, the court will deny its motion to seal.  GITI USA will have 15 days to renew its motion with a memorandum that complies with Rule 105.11. In the meantime, the papers will remain temporarily under seal.  If GITI USA does not renew its motion, the papers will be unsealed.

**V.  Conclusion**

For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction will be denied.  The motion to dismiss based on a failure to state a claim will be granted in part and denied in part.  The motion to seal discovery materials also will be denied, although GITI USA may renew its motion to seal within 15 days. Plaintiffs will have leave to amend their claims in accordance with this opinion.  A separate Order will follow.


                        _____/s/_____
                        DEBORAH K. CHASANOW
                        United States District Judge