IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ORTECK INTERNATIONAL INC., et al. | : | |
| v. | : | Civil Action No. DKC 2005-2882 |
| TRANSPACIFIC TIRE & WHEEL, INC., et al. | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this commercial contract case is the motion by Defendants TransPacific Tire & Wheel, Inc. et al. for summary judgment. (Paper 112).  The issues have been briefed fully and the court now rules, no hearing being deemed necessary.  Local Rule 105.6. For the following reasons, Defendants' motion will be granted.

**I.   Background**

**A.   Factual Background**

The following facts are either undisputed or viewed in the light most favorable to the non-moving parties, the Plaintiffs. Plaintiff Orteck International, Inc. ("Orteck") is a tire distributor that is incorporated and has its sole place of business in Maryland.  Plaintiff Venetian Investments ("Venetian") is a limited liability company organized under Maryland law.  Plaintiffs are both owned by the Veen family. Defendant TransPacific Tire & Wheel, Inc. ("TransPacific") is a corporation formed under California law in 2002.  Defendant GITI

China ("GTC") is a manufacturer of tires located in China. Defendant GITI USA ("GT USA") is corporation formed under Delaware law, which began its operations on November 1, 2005, after acquiring TransPacific's assets that were related to TransPacific's business with Chinese tire manufacturers. Defendant Brian Chan is a California resident and was an employee of GTC and TransPacific.  The court has subject matter jurisdiction because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest, legal fees, and costs.  28 U.S.C. §§ 1332 and 1334(b).

Plaintiffs allege causes of action concerning two purported agreements: an exclusive distribution agreement and an agreement concerning a warehouse in Maryland.

**1.   The Exclusive Distribution Agreement**

Orteck and GTC appear to have started their business relationship in the fall of 2001, when Sonny Veen ("Veen"), executive vice president of purchasing for Orteck, traveled to GTC's office in Shanghai, China and met with Y.C. Chong ("Chong") of GTC.  (Paper 112, Attach. 8, Veen PI Decl., ¶ 14). Veen testified that "[a]fter the meeting, GT[C] entered into a contract with Orteck for the exclusive wholesale distribution of

the Kaiyuan, Primewell, and GT brand truck tires in the United States."[1]  (*Id.*).

In October or November of 2001, Veen met with Chong and Brian Chan ("Chan"), representatives of GTC, at the Special Equipment Manufacturers Association ("SEMA") trade show in Las Vegas, Nevada.  (Paper 58 ¶ 28).  Orteck claims that Chan and Chong, on behalf of GTC, entered into a contract whereby Orteck would be the exclusive wholesale distributor of GTC-manufactured "Kaiyuan" brand tires in the United States.  (Paper 112, Attach. 5, Veen Dep., at 99:8-18).

Plaintiffs allege that an email exchange between Veen, Sunny Zhang (a purchasing agent who worked in China for Orteck) ("Zhang"), and Chong served to confirm the agreements made between Orteck and GTC in Las Vegas.  (Paper 58 ¶ 31).  Veen's email, addressed to Zhang and copying Chong, dated November 7, 2001, stated, in relevant part:

> Dear Sunny,
>
> Following are the details of our meeting with GT.
> We met with Brian Chan and Mr [sic] Chong.

---

[1] Plaintiffs refer to "Kaiyuan" brand tires as "Kiayuan" brand tires in their second amended complaint.  Defendants' motion for summary judgment and Plaintiffs' opposition to the motion both refer to the brand as "Kaiyuan."  This opinion adopts the spelling "Kaiyuan," on which the parties now appear to agree.

> Following points were discussed and agreed
> upon:
>
> 1.) Orteck will market the Kiayuan [sic]
> Radial Truck tires in USA [sic] and Canada.
> We will take their entire production and GT
> agreed not to offer the tire to any one
> [sic] else in USA or Canada. . . .
>
> . . .
>
> Regards,
> Sonny Veen

(Paper 112, Attach. 10, at 2-3).

Chong replied to Veen on November 13, 2001; he wrote:

> Dear Sonny, it.s [sic] good that we
> discussed some major issues in LV. I would
> like to in inform that there is an error in
> point 1). In the meeting, we mentioned that
> we would sell Kai Yuen [sic] brand to you in
> USA but not Canada. Pls [sic] take note.
>
> Regards,
> YCChong

(*Id.*, at 2).

In December 2001, Veen traveled to China to visit the Kaiyuan tire factory in Hefei, China. (Paper 58 ¶¶ 34-35). Plaintiffs allege that, during Veen's trip, GTC's employee Lily Huihua again confirmed that Orteck would be the exclusive wholesaler of Kaiyuan tires in the United States. (*Id.*).

In January 2002, Veen traveled to China for another meeting with GTC officials. (Paper 112, Attach. 5, Veen Dep., at 119:7-15). During this trip, Veen toured GTC's factory, and met with Chong, Huihua, and Chan. Plaintiffs allege that, during this

meeting, GTC informed Orteck that the "Kaiyuan" brand name would be changed to "Primewell".   Veen testified that many matters were discussed but that no "new agreement" was made at this meeting. (*Id.* at 122:16-21).

Plaintiffs assert that Huihua sent an email to Veen, copying Zhang, Chan, and Chong, on February 1, 2002, which confirmed the agreements reached between GTC and Orteck during Veen's visit to China.   (Paper 58 at ¶ 39).   Huihua's email stated:

> Dear Sonny,
>
> We thank you for your visit to our office on Jan. 22, 2002.   We would like to minute major points discussed as follows.
>
> I) TBR
>
> 1) The branding policy is discussed, Orteck would handle the Prime Well brand in USA market when the side plating is ready.   In the meantime, Orteck would continue taking the Kaiyuan brand.   Orteck would submit orders of Jan. Feb and March. . . .
>
> . . .
>
> Kind regards,
> Y C Chong/Lily

(Paper 112, Attach. 11, at 1-2).

In early September 2002, representatives from GTC and Orteck met in New York.   Plaintiffs allege that, at this meeting, Veen and Chong discussed the ongoing relationship between GTC and Orteck and their agreement that Plaintiffs would

be the exclusive distributor of Primewell tires. (Paper 112, Attach. 5, Veen Dep., at 133:3-17). On September 9, 2002, Veen sent Chong an email, which stated:

> Minutes of Meeting in NY.
>
> . . .
>
> 2) GT to suply [sic] PW exclusively to Orteck. GT to send their stock every week and orteck [sic] will place orders. Further Orteck can give a production plan to GT for PW production of TBR for the following month.
>
> . . .
>
> Please confirm the above and our meeting date at SEMA.
>
> Sonny Veen

(Paper 112, Attach. 12, at 1). On September 13, 2002, Chong responded:

> Dear Sonny,
>
> It's good meeting you and your team in NY. I will be back to office [sic] on 16th Sept. and will reply you [sic] by then.

(*Id.*). Veen replied to Chong's message on September 16, 2002, and stated: "Thanks for your reply. Please review the Minutes and give your comments." (Paper 112, Attach. 13, at 2). On September 24, Huihua replied to Veen in further response to Veen's September 9th email, copying Chan and Chong. Huihua responded to the thirteen points in Veen's email in the same thirteen-point format. Of relevance to Plaintiffs' allegations,

Huihua wrote:

> We refer to the below email:
>
> . . .
>
> 2) As per discussion in New York, G.T. currently sell [sic] to 2 buyers, i.e. Orteck and CII. [sic], the quantity is not more than 2x40hc per month. In the long run, we plan to sell only one party per brand in order not to cause conflict in the market. . . .
>
> . . .
>
> We trust the above is in order.
>
> Kind regards
>
> YC Chong/Lily

(Paper 112, Attach. 13, at 1).  Veen did not respond to Huihua's email.  (Paper 112, Attach. 5, Veen Dep., at 158:14-159:2).

On January 10, 2003, Huihua sent an email to Veen and Binjie Yang (an associate of Zhang in China), copying Chan and Chong, announcing that GTC had launched TransPacific, a company incorporated in California.  Huihua's email to Veen stated: "1. We are pleased to inform you that TransPacific Tire & Wheel, Inc. is incorporated in USA [sic] to handle and market Grandtour, Runway, Primewell and G.T. Radial brand tires in the North America region . . . . 3. Brian Chan is the President and CEO of this company . . . ."  (Paper 112, Attach. 15, at 1).

Plaintiffs contend that, despite the creation of the new company, Orteck believed it was still dealing with GTC.

Plaintiffs allege that this was true for several reasons, including:

> a.  GT China and TransPacific shared some of the same employees, for example, Brian Chan. . . .
>
> b.  In Orteck's experience with GT China, it was the custom for one person to act interchangeably on behalf of GT China, TransPacific and other entities that appear related to GT China . . . .
>
> c.  Employees of TransPacific sent emails from GT China's domain name, e-grandtour.com . . . .
>
> d.   GT China exercised control over TransPacific's business decisions . . . .
>
> e.  GT China continued to ship containers of tires to Orteck . . . .
>
> f.  Huihua, on behalf of GT China, stated in her January 10, 2003 email to Veen that TransPacific was formed to be an expansion of the GT Group.

(Paper 58 ¶ 42 a-f).

In February 2003, Veen traveled to California and met with Chan in TransPacific's offices.  During the meeting, Chan asked Veen for a list of Orteck's customers.  (*Id.* at ¶ 43).  Orteck agreed to provide the list.

Veen sent an email to Chan on February 7, 2003, which stated:

> Dear Brian,
>
> . . .

I have enclosed below the Minutes of our
meeting in L.A.  Please review them and let
me know of any discrepancies.

1) Marketing: . . . I requested to you in
the meeting and you agreed not to offer
Primewell and Milestone brand tires to any
other company in the USA and Canada. . . .
You may offer any other brands to these
markets.  Orteck has spent hundred [sic] of
thousands of dollars to promote the
Primewell/Milestone brand in the USA and
would like to be protected for all of its
efforts. . . .

Few of our large dealers are: Treadways,
laramrie, Dunlap & Kyle, GCR (Bridgestone),
American Tire Distributors (Heafner), S&S
Tire, Friend Tire, Reliable Tire, Del-Nat
Corp., A to Z tire, Purcell Tire, and many
other regional distributors.  As per our
understanding you will not offer any of
these tires to them.

. . .

Regards,

Sonny Veen

(Paper 112, Attach. 16, at 1-2).  Chan sent an email to Veen on

February 19, 2003, which stated:

Sonny,

Regarding the minutes of the meeting, I must
clarify with some points:

1) Market:
Orteck should inform us which customer [sic]
and territories they are working on.  So we
will not interfere [sic] Orteck customers as
long as they can penetrate the market as
requested by GT group and pay the invoice on
time.

2) Payment:

> At the moment, they [sic] are quite a few
> past orders that are due for payment.   But
> we did not receive them on time.   This is
> really a concern from our side.   We cannot
> guarantee that we are not going to sell
> goods to other people if Orteck doesn't pay
> the bill on time. . . .
>
> . . .
>
> Best Regards
> Brian Chan

(*Id.* at 1).   On February 25, 2003, Veen sent another email to
Chan, in which he wrote:

> Dear Brian,
>
> Since we are already selling [sic] the
> following customers please do not offer
> Primewell or GT brand radial truck to them.
>
> 1) Heafner (ATD)
> 2) Treadways
> 3) Del-Nat Corp
> 4) Dunlap & Kyle
> 5) Friend
> 7) S&S
> 8) A to Z
>
> Sonny Veen

(Paper 112, Attach. 19, at 1).   Finally, Chan sent a reply email
to Veen on February 26, 2003, in which he wrote:

> Sonny,
>
> We will not sell to these customers.
>
> Brian Chan

(*Id.*).

Veen wrote an email to Chan on October 29, 2003, which
stated that he had become aware that TransPacific and GTC had

sold Primewell brand tires to two of Orteck's customers, Heafner
and Treadways. (Paper 112, Attach. 20, at 1).  Veen wrote, "I do
not know how to proceed in the future unless you make a private
brand for me or we sign an agreement that TTW will not sell to
Orteck's customers . . . ."  (*Id.*).  Chan's reply to Veen's
email stated:

> I don't feel the fact [sic] you mentioned
> here are right.
> 1) Heafner called us trying to make an
> appointment in SEMA [sic] show.  We cannot
> say "no."  They also buy from Hercules and
> other Chinese manufacturer [sic].  We would
> like to discuss with them to see what they
> want to do.
>
> 2) Treadway [sic]: We met them long [sic]
> time ago for Runway project.  We still have
> something to discuss with them.
>
> Sonny, I know how important the multi-brand
> strategy is.  I believe Orteck has the
> capability to sell tires.  But I need to
> know how the business is really being
> handled. . . . I hope you can understand.
>
> Best Regards,
> Brian Chan

Veen testified that he was unable to recall any email after
October of 2003 that said that Orteck had an exclusive
distribution arrangement.  (Paper 112, Attach. 5, Veen Dep., at
231:21-233:5).

Orteck did not have written contracts with its customers.
(Paper 112, Attach. 5, Veen Dep., at 411:13-15).  Veen testified
that Orteck had "oral contracts" with its customers, but

characterized them as "my offer to sell and ship and their acceptance to buy and purchase constitutes a contract of supply." (*Id.* at 412:2-7).

One of Plaintiffs' allegations in this case is that Defendants sold tires to Orteck's customers in violation of an alleged exclusive distribution agreement with Orteck.   Veen admitted that there is no evidence that Defendants made any direct sales of Primewell tires to the following customers: Narsi, Pueblo, Barnwell, A to Z, Del-Nat, S&S Firestone, or Treadways.   (*Id.* at 420-:15-11).   Campbell testified that Defendants did not make any sales to Del-Nat, Dunlap & Kyle, Friend, S&S, Laramie, Purcell, or Treadways (except for one container that was not Primewell brand).   (Paper 112, Attach. 17, Campbell Dep., at 197:7-199:4-13).

TransPacific was approached by one of Orteck's customers, ATD, because ATD wanted a "factory direct relationship." (Paper 112, Attach. 33, Brown Dep., at 50:2-51:7).   ATD's Senior Vice President of Procurement for ATD from 2002 to April of 2006, Daniel K. Brown, testified that by the time ATD approached TransPacific, ATD had already made the decision to cease doing business with Orteck and other middleman suppliers.   (*Id.*).   As of December 16, 2005, Defendants and ATD had not finalized a supply agreement.   (*Id.* at 54:1-14).   At some point, Defendants

12

and ATD reached an agreement, after they had settled on a price point. (*Id.* at 57:8-16).

Orteck had a customer called GCR.  A GCR franchisee, Van Bell, contacted TransPacific via Chan in 2004 to buy tires for its Los Angeles stores.  (Paper 112, Attach. 7, Chan Dep. at 180:18-21; Attach. 21, DeIorio Decl. ¶ 33).  Subsequently, TransPacific sold tires to Van Bell.

### 2.   The Warehouse Agreement

The second agreement in dispute concerns the establishment of a warehouse in Silver Spring, Maryland.

In early 2004, Veen attended a meeting at TransPacific's headquarters in California.  (*Orteck*, Paper 112, Attach. 5, Veen Dep., at 290:3-6).  TransPacific's representatives Vic DeIorio ("DeIorio") and Chan were also present at the meeting.  (*Orteck*, Paper 112, Attach. 7, Chan Dep., at 276:2-20; Attach. 14, DeIorio Dep., at 153:11-21).  At the meeting, Veen, Chan, and DeIorio discussed a possible arrangement whereby each company would pay half of the expenses for a warehouse in Maryland (the "Maryland Warehouse") where TransPacific and Orteck could both store tires.  Veen testified, however, that the agreement concerning the Maryland Warehouse was "never finalized . . . [Orteck and TransPacific] had an agreement but there were a lot of issues that were still open so we never came to a final, final agreement."  (Paper 112, Attach. 5, Veen Dep., at 299:9-

14).  The alleged agreement was not reduced to a written document.  (*Id.* at 301:16-19, 337:13-20).  Additionally, Veen could not recall any documents in which TransPacific agreed to pay half of the Maryland Warehouse expenses.  (Paper 112, Attach. 5, Veen Dep., at 308:16-309:4, 316:13-318:1).

On February 13, 2004, Veen wrote to Chan to propose using a warehouse located at 12201 Old Columbia Pike, Silver Spring, Maryland 20904.  Veen and Chan exchanged emails over the following days regarding the warehouse rent and other costs.  Chan wrote to Veen regarding potential risks to TransPacific, and Veen replied in an email on February 17th, which stated, in relevant part:

> Every business venture has risks.
>
> Orteck has to invest 150,000 in warehouse racking and equipment, have overall payroll of $250,00 [sic] per year.  Just in the first year we have to spend $500,000.  Orteck will make profit to cover the expenses, but the long term benefit goes to [TransPacific] as Primewell is your brand.  If you were making Orteck brand then the deal would be different.
>
> [TransPacific] has NO RISK.  Even if the tires are not sold they are still your asset and fully insured, what is your risk??

(Paper 112, Attach. 26, at 1-2).  Orteck negotiated and signed the lease for the Maryland Warehouse.  (Paper 112, Attach. 27, Maryland Warehouse Lease; Attach. 5, Veen Dep., at 321:2-21).

In September or October 2004, Chan telephoned Veen. Plaintiffs allege that Chan told Veen that he was in China and had met with Sjamsul Nursalim, who controlled GTC and TransPacific. (Paper 58 ¶ 68). Chan purportedly advised Veen to purchase the Maryland Warehouse because Nursalim had "big plans" for the relationship between Orteck and GTC. (*Id.*). Sometime thereafter, Orteck arranged to buy the Maryland Warehouse through Venetian. (*Id.*). Chan denied ever making this statement or otherwise encouraging Veen to buy the Maryland Warehouse. (Paper 112, Attach. 7, Chan Dep., at 273:12-274:1).

Venetian entered into a purchase agreement with the Maryland Warehouse landlord and paid a $200,000 non-refundable deposit. (Paper 58 at ¶ 69). Plaintiffs maintain that although TransPacific representatives made at least four visits to Maryland between April and September 2004, TransPacific breached its agreement to lease the Maryland Warehouse from Orteck. As a result, Orteck asserts that it could no longer afford to purchase the property and incurred losses from its improvements to the property.[5]

---

[5] Pursuant to the terms of the existing lease on the warehouse, these improvements became part of the warehouse and the property of the warehouse landlord when Plaintiffs were unable to purchase the warehouse.

## B.    Procedural Background

Plaintiffs initiated this action by filing a complaint on October 21, 2005.  (Paper 1).  Plaintiffs filed an amended complaint on November 4, 2005, along with a motion for preliminary injunction on November 18, 2005, which was denied by an Order entered on January 6, 2006.  (Papers 3, 6, and 30). Plaintiffs' amended complaint asserted thirteen counts, including claims for fraud, participation in a racketeering conspiracy, negligent misrepresentation, breach of contract, conversion, intentional interference with contractual and business relationships, unjust enrichment, promissory estoppel, and civil conspiracy.  Defendants moved to dismiss the amended complaint (Paper 53), and this motion was granted in part and denied in part by the court's September 5, 2006 Order, which granted Plaintiffs leave to replead their allegations of fraud, racketeering, negligent misrepresentation, and promissory estoppel.  (Paper 55).

Plaintiffs filed a second amended complaint on September 20, 2006.  (Paper 58).  On October 5, 2006, Defendants GTC, Brian Chan, and TransPacific moved to dismiss six Counts of the second amended complaint.  (Paper 59).  Defendants' motion was granted in part by the court's September 17, 2007 Order with respect to Counts I (fraud), II-IV (racketeering), and V (negligent misrepresentation) and those Counts were dismissed.

16

(Paper 64).  Defendants' motion was denied in part as to Count X (promissory estoppel).  (*Id.*).

Plaintiffs' remaining claims are based on four premises: (1) Orteck was granted an exclusive distribution agreement by GTC to sell Kaiyuan and Primewell Tires in the United States; (2) Defendants entered into a conspiracy to breach and interfere with this agreement by taking a confidential Orteck customer list and selling GTC-manufactured tires directly to Orteck's customers; (3) Defendants induced Plaintiffs to purchase the Maryland Warehouse and agreed to pay Plaintiffs for half of the Maryland Warehouse expenses apart from rent; and (4) Orteck's customers stopped buying tires from Orteck as a result of the scheme.

Defendants filed a motion for summary judgment on June 19, 2009.  (Paper 112).  Defendants ask the court to grant summary judgment on all of Plaintiffs' claims in the second amended complaint.  (*Id.* at 1).

## II.   Summary Judgment

### A.   Standard of Review

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   *See*

Fed.R.Civ.P 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, if there clearly exists factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007); *Emmett,* 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be

"sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. (citations omitted).

## B.   Analysis

Defendants move for summary judgment on all of Plaintiffs' remaining claims in the second amended complaint: breach of contract (Count VI); tortious interference (Count VII); unjust enrichment (Count IX); promissory estoppel (Count X); injunction (Count XI); accounting (Count XII); and conspiracy (Count XIII). Each claim is analyzed separately for summary judgment.

### 1.   Breach of Contract

Count VI of Plaintiffs' second amended complaint presents two breach of contract claims.  First, Plaintiffs claim that GTC and TransPacific breached "the contracts between GTC and Orteck pursuant to which Orteck was the exclusive distributor" of the Kaiyuan and Primewell brands of GTC Tires.  (Paper 58 ¶ 250). Second, Plaintiffs claim that "GT China and TransPacific breached the Maryland Warehouse Agreement and refused to pay Orteck for half the expenses associated with the Maryland Warehouse." (*Id.* ¶¶ 252-53).

### a.   Exclusive Distribution Agreement

Defendants argue that the court should enter judgment as a matter of law on Orteck's exclusive distribution agreement claim because the claim fails under Maryland's Statute of Frauds. (Paper 121, Attach. 1, at 6).  Defendants contend that although Plaintiffs allege a "handshake deal" between the parties, any agreement was not reduced to writing.  Defendants also assert that the writings Plaintiffs have produced – emails between various employees of Plaintiffs and Defendants – do not meet the requirements to show an enforceable contract under the Statute of Frauds.

Additionally, Defendants argue that the alleged exclusive distribution agreement is void and unenforceable because the parties failed to agree on essential terms.  Defendants state that the parties did not even discuss "essential terms such as the duration of the alleged exclusive distribution agreement, the circumstances under which such an agreement could be terminated, performance standards governing each party, price and payment terms, the governing law, or any number of material terms."  (*Id.* at 15).  Defendants contend that a contract is unenforceable under Maryland law when a material term is left undefined by the parties.  Defendants conclude that summary judgment should be granted on Plaintiffs' exclusive distribution claim because "it is undisputed that the parties failed to reach

a meeting of the minds sufficient to result in the formation of an exclusive distribution contract" and therefore "the alleged oral agreement is too vague and uncertain to be enforced." (*Id.* at 19, 21).

Plaintiffs counter that the evidence establishes an exclusive distribution agreement that satisfies the Statute of Frauds. Plaintiffs point to the November 2001 emails exchanged between Veen and Chong. (Paper 118, at 3). Veen sent the first email to Zhang (an agent for Orteck) and copied Chong. Veen's November 7, 2001 email stated that Orteck would take GTC's entire production of Kaiyuan tires and that GTC would not offer the tires to anyone else in the USA or Canada. (Paper 112, Attach. 10, at 2-3). Chong's November 13, 2001 response to Veen stated that there was an error in Veen's email and that GTC would sell the Kaiyuan brand to Orteck in the USA but not in Canada. Plaintiffs assert, "This email is evidence that GT China did not dispute that it had agreed to an exclusive distribution agreement with Orteck at the meeting in Las Vegas." (Paper 118, at 4).

Plaintiffs argue that these emails satisfy the Statute of Frauds because they establish the "existence of a contract for the exclusive sale of tires in the United States, a quantity that is identified as the 'entire production' manufactured by GTC, and that the emails were 'signed.'" (*Id.*). Plaintiffs

conclude, "[t]he Original E-mail and the subsequent meetings evidence that there was an exclusive distribution contract which induced both parties to conduct business consistent with that contract." (*Id.* at 6).

Furthermore, Plaintiffs contend that even if the writings are insufficient to constitute an enforceable contract under the Statute of Frauds, two of the exceptions to the writing requirement under the Statute of Frauds apply: the "merchant exception" and the "part performance" exception. The "merchant exception," Md. Code Ann., Com. Law § 2-201, provides:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

*Id.* Plaintiffs contend that "Chong's failure to state an objection to the Original E-mail other than to dispute the territory makes the writing sufficient to satisfy the statute of frauds." (Paper 118, at 8).

Plaintiffs also argue that the "part performance" exception, Md. Code Ann., Com. Law § 2-201(3)(c), "takes the contract out of the statute of frauds." (Paper 118, at 9).

22

The "part performance" exception states:

> (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable
>
> . . .
>
> (c) With respect to goods for which payment has been made and accepted or which have been received and accepted (§ 2-606).

*Id.* at § 2-201(3)(c).  Plaintiffs allege that an enforceable contract existed between the parties because the parties

> exchanged tires and payments pursuant to the exclusive distribution agreement.   The continual exchange of tires, payment for those tires, and the continual chain of communication between the parties, is evidence that there was performance by both parties in furtherance of the exclusive contract.

(Paper 118, at 9-10).   Therefore, Plaintiffs argue that the contract is enforceable despite the Statute of Frauds.

Furthermore, Plaintiffs contend that the course of dealing between the parties evidences that an exclusive distribution agreement was entered.  (Paper 118, at 10-15).  Plaintiffs point to an email sent by Huihua to Veen in January 2002.  (Paper 118, at 10).   Huihua's email stated that Orteck would handle the Primewell brand in the United States market "when the side plating is ready," and that in the meantime, "Orteck would continue taking the Kaiyuan brand." (Paper 112, Attach. 11, at 1-2).  Plaintiffs assert that Huihua's use of the word "handle" evidenced the exclusive distribution agreement that the parties

discussed orally during their meeting in Shanghai, China.
(Paper 118, at 6).  Additionally, Plaintiffs cite a September
2002 email exchange between Veen, Chong, and Huihua as support
for their course of dealing argument.  In this exchange, in
relevant part, Veen wrote on September 9, 2002 that GTC was to
supply Primewell tires exclusively to Orteck and asked Chong to
confirm that statement. (Paper 112, Attach. 12, at 1).  Chong
and Huihua responded on September 24, 2002, and stated, "As per
discussion in New York, G.T. currently sell [sic] to 2 buyers,
*i.e.* Orteck and CII." (Paper 112, Attach. 13, at 1).

Finally, Plaintiffs argue that the parties agreed on the
terms of the exclusive distribution agreement.  Plaintiffs
state, "In this case, the terms of the contract between the
parties are sufficiently definite or reasonably determinable to
withstand a motion for summary judgment." (Paper 118, at 15).
Plaintiffs contend that it is unclear what material terms are
necessary to establish an enforceable exclusive distribution
agreement, and that enough material terms were established.

The Maryland Statute of Frauds must be applied to determine
whether Orteck's alleged oral contract with Defendants is
enforceable.  The Maryland Uniform Commercial Code provides:

> . . . a contract for the sale of goods for
> the price of $500 or more is not enforceable
> by way of action or defense unless there is
> some writing sufficient to indicate that a
> contract for sale has been made between the

24

parties and signed by the party against whom
enforcement is sought or by his authorized
agent or broker.

Md. Code Ann., Com. Law. § 2-201(1).  The court previously

determined that Maryland's Statute of Frauds applies to the

alleged exclusive distribution agreement in this case, stating:

> In *Cavalier Mobile Homes, Inc. v. Liberty*
> *Homes, Inc.*, 53 Md.App. 379 (1983), *cert.*
> *denied*, 295 Md. 736 (1983), the Court of
> Special Appeals of Maryland specified the
> applicable law:
>
> > The Maryland Uniform Commercial
> > Code, [Md.Code Ann., Com. Law]
> > § 2-106 . . . defines "contract
> > for sale" to include both a
> > "present sale of goods and a
> > contract to sell goods at a future
> > time." It follows therefrom that
> > dealership or distributorship
> > contracts fall within the sales
> > provisions of the U.C.C.  *Artman*
> > *v. International Harvester Co.*,
> > 355 F.Supp. 482, 486 (W.D.Pa.
> > 1973).  It also follows that the
> > Article II Statute of Frauds,
> > found at § 2-201, applies to such
> > agreements.
>
> *Cavalier Mobile Homes, Inc.*, 53 Md. at 394.
> Hence, the alleged exclusive distributorship
> agreement is governed by Maryland's U.C.C.,
> including the U.C.C.'s statute of frauds.

(Paper 54, at 55).

To comply with the Statute of Frauds, there must exist a

writing that (1) evidences a contract for the sale of goods; (2)

is signed by the party against whom it is to be enforced; and

(3) specifies the quantity of the goods to be sold.   Md. Code Ann., Com. Law. § 2-201.

Plaintiffs' evidence does not satisfy the Statute of Frauds.   Plaintiffs conceded that the exclusive distributorship agreement they allege was an oral contract and was not reduced to a signed writing.   Even so, Plaintiffs rely on email communications that supposedly memorialize the terms of the alleged oral agreement.   Plaintiffs incorrectly argue that the November 2001 emails between Veen and Chong satisfy the Statute of Frauds.   Chong's email is the relevant writing, because that is the only writing in the email exchange that was signed by a representative for the party against whom Plaintiffs seek to enforce the alleged distribution agreement.   Chong's email did not specify a contract or a quantity of goods to be sold.   Even if Veen's email indicated that Orteck would take the quantity of the "entire production" of Kaiyuan tires, Chong's email does not confirm that quantity, nor does it confirm that a contract was made between the parties.   Instead, Chong's email disputes one point in Veen's email: that GTC would not sell Kaiyuan tires to Orteck in Canada.   Plaintiffs refer to other email exchanges when they later argue that their course of dealing shows that an exclusive distribution agreement was made.   None of the emails mentioned by Plaintiffs, including those exchanged by Veen, Huihua, and Chong, satisfy the three requirements for a writing

that would show an enforceable contract under the Statute of Frauds.  Overall, the emails Plaintiffs have produced show that a non-exclusive supplier-customer relationship existed between the parties, but they do not satisfy the Statute of Frauds to show that Defendants gave Orteck any enforceable exclusive distribution rights for Kaiyuan or Primewell tires.

Additionally, the "merchant exception" and the "part performance exception" to the Statute of Frauds do not apply here.  The "merchant exception" is inapplicable to the writings in this case because the exception requires: 1) a writing in confirmation of a contract; 2) sent between merchants; 3) that is sent to a party who has reason to know of its contents; and 4) that the party receiving the writing does not give written notice of objection to the contents within ten days of receiving the writing.  Md. Code Ann., Com. Law § 2-201.  The emails on which Plaintiffs rely to satisfy the Statue of Frauds show that Veen sent Zhang an email on November 7, 2001, and that Chong replied on November 13, 2001.  First, it is unclear that the email exchange evidences a writing sent between merchants because Chong was only copied on the email message.  But, even setting aside that issue, Chong's response to Veen objected to the contents of Veen's email and was sent within ten days of Veen's initial email.  Thus, the "merchant exception" does not apply here.  Additionally, the "part performance exception" does

27

not apply to establish an ongoing exclusive distribution agreement because "'[p]artial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted and for which payment has been made and accepted."  Md. Code Ann., Com. Law. § 2-201, cmt. 2. In other words, while the "part performance exception" may be used to prove a contract existed for goods for which payment was made, it does not apply prospectively to ensure that goods will be delivered in the future or to establish an exclusive right to buy those goods.

Because the alleged exclusive distribution agreement fails to satisfy the Statute of Frauds, the court does not need to reach whether the parties agreed on the material terms necessary to establish an exclusive distribution agreement.  Furthermore, the course of dealing between the parties is irrelevant to the Statute of Frauds issue.  *See Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md.App. 379, 396 (1983)(finding that the parties' course of dealing could not supply the quantity term to satisfy the Statute of Frauds because a series of contracts did not indicate that a requirements contract existed).

Plaintiffs have failed to produce any writing that fulfills all three of the Statute of Frauds requirements, so summary judgment will be granted for Defendants on the exclusive distribution agreement claim in Plaintiffs' Count VI.

b.   **Maryland Warehouse Agreement**

Defendants argue that Plaintiffs' breach of contract claim regarding the Maryland Warehouse cannot survive summary judgment because the alleged agreement was not finalized. (Paper 121, Attach. 1, at 47).   Defendants contend that because there was never a written agreement concerning the Maryland Warehouse, and because any oral discussions were never finalized into an agreement, Defendants could not have breached any agreement.

Plaintiffs counter that summary judgment is not appropriate on their Maryland Warehouse Agreement breach of contract claim because "[t]he evidence is clear that there was an agreement," but "the terms of the agreement are disputed." (Paper 118, at 33).   Plaintiffs assert, "Chan reached an agreement with Veen to open up the Maryland warehouse and share the cost 50/50." (*Id.*)(citing Paper 112, Attach. 7, Chan Dep., at 236:1-21, 237:1-4).   Additionally, Plaintiffs state, "Orteck and Transpacific [sic] reached a partial agreement with respect to the Maryland warehouse." (Paper 11, at 33).   Plaintiffs assert that this partial agreement consisted of the following terms: "It was agreed that Orteck and Transpacific [sic] would operate as a joint venture.   Transpacific [sic]  would ship tires. Orteck would manage, maintain and run the warehouse.   All expenses would be paid monthly and would be shared equally between Transpacific [sic] and Orteck."   (*Id.*)(internal

citations omitted).  Plaintiffs contend that "[o]ther areas were discussed but not finally agreed upon." (*Id.*).

Plaintiffs have not established that an agreement was ever reached so as to create an enforceable contract that could be breached.  Veen testified that there was never a written agreement concerning the Maryland Warehouse.  (Paper 112, Attach. 5, Veen Dep., 301:16-19, 337:13-20).  As for an oral agreement, Veen's testimony indicates that a final agreement was never reached:

> Q.  What was the agreement with respect to the warehouse?  Can you give me the terms as you understand it?
>
> A.  The agreement was a work in process.  It was never finalized.  It was still being worked on.
>
> Q.  When what?  When this lawsuit was filed?
>
> A.  It was never finalized.
>
> Q.  Is it your testimony that you never had a final agreement about the Maryland warehouse?
>
> A.  We had an agreement but there were a lot of issues that were still open so we never came to a final, final agreement.
>
> Q.  What was the agreement that you had?
>
> A.  The agreement we had was that this would be a joint venture between Orteck and Transpacific [sic].  Orteck would order tires.  Transpacific [sic] would ship those tires.  Orteck would manage, maintain and run the warehouse.  All the expenses would be paid monthly and would be shared equally between Transpacific [sic] and Orteck.

(Paper 112, Attach. 5, Veen Dep., at 298:15-300:2). By Plaintiffs' own admission, an enforceable agreement never existed because essential terms of that agreement were not finalized. Therefore, summary judgment will be granted in favor of Defendants on Plaintiffs' breach of contract claim in Count VI regarding the Maryland Warehouse Agreement.

### 2.   Tortious Interference

Defendants argue that Plaintiffs' tortious interference claim, Count VII, fails as a matter of law. Defendants assert that they did not wrongfully interfere with any contract that Orteck had with a third party, nor did they wrongfully interfere with any of Orteck's business relationships. (Paper 121, Attach. 1, at 26). Defendants contend, "There is no allegation in the [second amended complaint], and no evidence in the record that Orteck had any supply contracts with any of its customers that were not terminable at will." (*Id.* at 27). Furthermore, Defendants correctly note that there was "no exclusive distribution agreement between [GTC] and Orteck that TransPacific could have 'interfered with.'" (*Id.*). Defendants maintain that because Plaintiffs have not shown that Defendants interfered with any existing contract, Plaintiffs must show that Defendants have maliciously or wrongfully infringed on an economic relationship. Defendants contend that Plaintiffs have

not provided evidence that would establish any of the elements necessary to prove Defendants' malicious or wrongful behavior.

Plaintiffs respond that Defendants both interfered with Orteck's existing contracts and maliciously or wrongfully infringed on Orteck's economic relationships. Plaintiffs allege that GTC, TransPacific, and Chan engaged in an intentional scheme to eliminate Orteck as a competitor. Plaintiffs contend that the scheme included: 1) obtaining Orteck's customer list and selling to Orteck's customers, specifically ATD and GCR, which violated an agreement to not sell to Orteck's customers; and 2) failing to provide proper sales support to Orteck as a distributor and to acknowledge to Orteck's customers that Orteck's problems in shipping tires were a result of problems at GTC's factory in China. (Paper 118, at 20). Plaintiffs argue that Defendants interfered with Orteck's relationship with its customer GCR when Defendants "wrongfully breached the Maryland Warehouse Agreement," because "[t]he Maryland Warehouse was a major component to the development of the relationship between Orteck and GCR." (*Id.*, at 21). Additionally, Plaintiffs contend that TransPacific interfered with Orteck's relationship with its customer ATD when "TransPacific began to offer ATD similar tires to the Primewell brand." (*Id.*). Plaintiffs conclude that "[a]s a result of the actions of the Defendant's [sic], Orteck lost its ability to do business with and sell

32

Primewell tires to ATD, GCR and all of the customers on its customer list." (*Id.* at 21).  As such, Plaintiffs argue that they have presented enough evidence on their tortious interference claim to withstand summary judgment.

Under Maryland law, the tort of intentional interference with contractual relations has two manifestations: "the tort . . . is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 297 (1994).  The two types of tort actions differ in terms of the amount of interference that is tolerated.  "[W]here a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted.  A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *Natural Design v. Rouse Co.*, 302 Md. 47, 69-70 (1984).

To prove a claim for tortious interference where a contract exists, a plaintiff must show: "1) existence of a contract between [the] plaintiff and a third party; 2) [the] defendant's knowledge of that contract; 3) [the] defendant's intentional interference with that contract; 4) breach of that contract by

the third party; 5) resulting damages to the plaintiff." *Fraidin v. Weitzman*, 93 Md.App. 168, 189 (1992), *cert. denied*, 329 Md. 109 (1993)(citing *Fowler v. Printers II*, 89 Md.App. 448, 466 (1991)).

In order to assert a claim where no contract exists or where a contract terminable at will is involved (i.e., the broader manifestation of the tort), a plaintiff must show: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Natural Design, Inc.*, 302 Md. at 71 (internal quotation marks omitted).

Plaintiffs have not established a claim for the first type of tortious interference. Plaintiffs have not pointed to a specific contract with a third party with which Defendants have interfered to cause a breach. Additionally, Plaintiffs have not presented evidence that Orteck had any supply contracts with any customers that were not terminable at will. Veen testified that Orteck had "oral contracts" with its customers, but characterized them as "my offer to sell and ship and their acceptance to buy and purchase constitutes a contract of supply." (Paper 112, Attach. 5, Veen Dep., at 412:2-7).

34

Furthermore, Plaintiffs have not provided evidence to establish each of the elements to assert a tortious interference claim where no contract exists.  Plaintiffs' brief appears to concede that Plaintiffs' tortious interference claim only relates to Defendants' dealings with ATD and GCR.  First, Plaintiffs claim that TransPacific tortiously interfered with GCR by breaching the Maryland Warehouse Agreement.  The court has already found, however, that Defendants did not breach the Maryland Warehouse Agreement because the agreement was never an enforceable contract.  Therefore, Defendants did not tortiously interfere with Plaintiffs' relationship with GCR.  Second, as to Defendants' relationship with ATD, Plaintiffs have not established that Defendants did anything in their dealings with ATD that was intentionally calculated to cause damage or loss to Plaintiffs' business or was done with unlawful purpose to cause damage and loss, without right or justifiable cause.  ATD's Senior Vice President of Procurement for ATD from 2002 to April of 2006, Daniel K. Brown, testified that by the time ATD approached TransPacific to buy tires, ATD had already made the decision to cease doing business with Orteck and other middleman suppliers.  (Paper 112, Attach. 33, Brown Dep., at 50:2-51:7). Though TransPacific eventually sold tires to ATD, Brown's undisputed testimony demonstrates that TransPacific's actions were not calculated to cause Orteck to lose its business

dealings with ATD and did not result in lost business with ATD. Therefore, summary judgment will be granted in favor of Defendants on Plaintiffs' tortious interference claim in Count VII of Plaintiffs' second amended complaint.

### 3.  Unjust Enrichment

Defendants argue that summary judgment should be granted in their favor on Plaintiffs' Count IX because Plaintiffs fail to establish the three elements required for an unjust enrichment claim.  Defendants assert that TransPacific's receipt of Orteck's customer list did not confer any "benefit" on TransPacific and to the extent that Defendants made sales to any of Orteck's customers, it was not "inequitable" for Defendants to "retain" those benefits.  (Paper 121, Attach. 1, at 33).

Plaintiffs respond that Defendants should not be entitled to summary judgment on Plaintiffs' unjust enrichment claim because there is an issue of material fact as to whether Defendants obtained a benefit from Plaintiffs.  Plaintiffs assert, "As a result of obtaining the customer list from their largest distributor, the Defendants were able to solicit the customers developed through the marketing and sales efforts undertaken by Orteck over several years."  (Paper 118, at 23). Plaintiffs state that the "Defendants obtained the benefit of (1) the marketing efforts of Orteck between 2000 and 2004; (2) the relationships with customers that Orteck developed between

2000 and 2004; and (3) Orteck's customer list." (*Id.*). Plaintiffs claim that Defendants unjustly retained these benefits because "Transpacific [sic] was able to supplant Orteck and insert itself into the position that Orteck had previously occupied, particularly in the case of ATD." (*Id.*).

Under Maryland law, unjust enrichment is defined as:

> the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. A person is enriched if he has received a benefit, and he is unjustly enriched if retention of the benefit would be unjust. Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another.

*Everhart v. Miles*, 47 Md.App. 131, 136 (1980)(citing Am.Jur.2d Restitution and Implied Contracts § 3 (1973)(footnote omitted)). An unjust enrichment claim requires proof of three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Everhart*, 47 Md.App. at 136 (citing Williston on Contracts § 1479 (3$^d$ ed. 1970)).

Defendants are entitled to summary judgment in their favor on Plaintiffs' unjust enrichment claim. Plaintiffs have not

presented evidence that Defendants received a benefit from obtaining their customer list that would not have been obtained if Orteck had not provided TransPacific with the list. While Plaintiffs allege that Defendants were able to solicit Orteck's customers because of Orteck's customer list, the record does not show that Defendants solicited any of Orteck's customers. Veen admitted that there is no evidence that Defendants made any direct sales of Primewell tires to the following customers: Narsi, Pueblo, Barnwell, A to Z, Del-Nat, S&S Firestone, or Treadways. (*Id.* at 420-:15-11). Campbell testified that Defendants did not make any sales to Del-Nat, Dunlap & Kyle, Friend, S&S, Laramie, Purcell, or Treadways (except for one container that was not Primewell brand). (Paper 112, Attach. 17, Campbell Dep., at 197:7-199:4-13). TransPacific made sales to two of Orteck's customers, GCR and ATD, but in each of those cases it is undisputed that TransPacific was approached by the customer and did not solicit their business by using Orteck's customer list. (Paper 112, Attach. 33, Brown Dep., at 50:2-51:7; Attach. 7, Chan Dep. at 180:18-21; Attach. 21, DeIorio Decl. ¶ 33). Therefore, Plaintiffs cannot establish that Orteck's customer list conferred any benefit on Defendants or that it would be inequitable for Defendants to retain any profits they earned from their sales to ATD and GCR. Accordingly, summary judgment will be granted in favor of

Defendants on Plaintiffs' unjust enrichment claim in Count IX of Plaintiffs' second amended complaint.

### 4.   **Promissory Estoppel**

Defendants argue that Plaintiffs' promissory estoppel claim, Count X of Plaintiffs' second amended complaint, fails as a matter of law because Defendants did not make a clear and definite promise on which Plaintiffs reasonably relied. Defendants assert that their statements regarding the alleged exclusive distribution agreement and the Maryland Warehouse were not clear and definite promises because they did not "reasonably define the contours of the action or forbearance." (Paper 121, Attach. 1, at 22, 48)(citing *McKenzie v. Comcast Cable Commc'ns, Inc.*, 393 F.Supp.2d 362, 367-73 (D.Md. 2005)).   Additionally, Defendants argue that Plaintiffs' reliance on any of Defendants' statements regarding the exclusive distribution agreement or Maryland Warehouse was unreasonable because the essential terms of those agreements were not finalized.   (Paper 121, Attach. 1, at 24-26, 48).

Plaintiffs counter that "there is a dispute of material fact with regard to the promissory estoppel claim as pertains to both the exclusive distributorship agreement and the specific promise not to sell to Orteck's customers." (Paper 118, at 18). As for the exclusive distribution agreement, Plaintiffs state, "Defendants and Orteck entered into the exclusive distributor

contracts which made Orteck an exclusive wholesale distributor of Primewell truck tires in the United States." (*Id.*). Additionally, Plaintiffs report that "Bruce Campbell has testified that it was widely understood that there was an exclusive distribution agreement between TransPacific and Orteck." (*Id.*). Plaintiffs also claim that Defendants made a clear and definite promise to not sell to Orteck's customers in an email exchange between Chan and Veen on February 25, 2003, in which Veen stated:

> Dear Brian,
>
> Since we are already selling [sic] the following customers please do not offer Primewell or GT brand radial truck to them.
>
> 1) Heafner (ATD)
> 2) Treadways
> 3) Del-Nat Corp
> 4) Dunlap & Kyle
> 5) Friend
> 7) S&S
> 8) A to Z
>
> Sonny Veen

(Paper 112, Attach. 19, at 1).  And Chan's reply stated:

> Sonny,
>
> We will not sell to these customers.
>
> Brian Chan

(*Id.*).  Plaintiffs reference Chan's email as support for their assertion that "GT China, TransPacific and Chan also specifically promised that they would not sell to the customers

listed on Orteck's customer list, if Orteck gave them a copy of the list." (*Id.*). Finally, Plaintiffs contend that it was reasonable for them to rely on Defendants' promises, citing as support emails "regarding pricing, size of tires and other marketing and sales issues" and an email in which "[GTC] promised that it would prepare the advertising poster for the Primewell tires of Orteck." (Paper 118, at 19).

To succeed on a promissory estoppel claim, a plaintiff must show four elements, which Maryland courts adopted from the Restatement (Second) of Contracts § 90(1) (1979):

> 1. a clear and definite promise;
>
> 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
>
> 3. which does induce actual and reasonable action or forbearance by the promisee; and
>
> 4. causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 166 (1996). The promisee's reliance must be "substantial and definite" in order for the court to compel enforcement of the promise. *Id.* at 166 n. 29 ("If the reliance is not 'substantial and definite' justice will not compel enforcement.").

Summary judgment will be granted to Defendants on Plaintiffs' Count X, promissory estoppel.

First, Plaintiffs have not shown that there was a clear and definite promise regarding the exclusive distribution agreement. None of the emails that Plaintiffs have submitted contain a promise of exclusive distribution rights. Additionally, Plaintiffs have not presented evidence that any oral agreement regarding distribution rights was clear and definite. Veen admitted that the parties did not agree on terms of the exclusive distribution agreement such as the duration of any distribution rights or how the rights could be terminated. (Paper 112, Attach. 5, Veen Dep., at 123:5-124:13). Furthermore, Plaintiffs have not shown that they reasonably relied on any promise Defendants may have made regarding distribution rights. Though Plaintiffs believed that the duration of the exclusive distribution agreement was indefinite, this was not a reasonable assumption. *See Kiley v. First Nat. Bank of Maryland*, 102 Md.App. 317, 337 (1994)(upholding summary judgment where "[a]ny claimed reliance that the [plaintiffs] may have had on the alleged promise to maintain forever the original terms of the account would have been unreasonable.").

As for the Maryland Warehouse, Plaintiffs have not established that there was a clear and definite promise because Veen admitted that the agreement between the parties regarding the Maryland Warehouse was never finalized. (Paper 112, Attach. 5, Veen Dep., at 299:9-14). As the parties never came to a

42

finalized agreement regarding the Maryland Warehouse, it would also have been unreasonable for Plaintiffs to rely on any representations Defendants made regarding the Maryland Warehouse.

Finally, Plaintiffs have not satisfied the elements of promissory estoppel for their claim regarding Defendants' promise to not sell tires to Orteck's customers. Chan's February 25, 2003 statement to Veen, "We will not sell to these customers," is not a clear and definite promise. Less than a week earlier, on February 19, 2003, Chan had written to Veen in response to Veen's request that TransPacific not sell to Orteck's customers:

> Sonny,
>
> Regarding the minutes of the meeting, I must clarify with some points:
>
> 1) Market:
> Orteck should inform us which customer [sic] and territories they are working on.  So we will not interfere [sic] Orteck customers as long as they can penetrate the market as requested by GT group and pay the invoice on time.
>
> 2) Payment:
> At the moment, they [sic] are quite a few past orders that are due for payment.  But we did not receive them on time.  This is really a concern from our side.  We cannot guarantee that we are not going to sell goods to other people if Orteck doesn't pay the bill on time. . . .
>
> . . .

                    Best Regards
                    Brian Chan

(*Id.* at 1).   Chan's statement that TransPacific would not sell tires to Orteck's customers is far from "clear and definite" given Chan's earlier instruction that TransPacific would not sell to certain customers unless Orteck could "penetrate the market as requested by GT group and pay the invoice on time." (*Id.*).   Additionally, Plaintiffs have not shown how their reliance on Chan's statement was reasonable, how their reliance on that statement was "substantial and definite," or how any damages they claim specifically relate to Chan's statement. "Damages recoverable under a claim of detrimental reliance are carefully circumscribed; the plaintiff may recover only those specific expenditures made in reliance upon the defendant's promise."   *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1078-79 (4th Cir. 1982)(applying Maryland law).   While Plaintiffs generally assert that "Orteck spent close to $2.5 million in a period of four (4) to five (5) years in trade shows, salaries, insurance, legal, marketing [sic] expense [sic] to promote Primewell tires," and claim $150,000,000 in compensatory damages in this case, Plaintiffs do not provide evidence to show what specific expenditures were made in reliance on Chan's statement.   (Paper 119 ¶ 156).

44

Therefore, summary judgment will be granted in favor of Defendants on Plaintiffs' promissory estoppel claim in Count X of Plaintiffs' second amended complaint.

### 5. Conspiracy

Defendants assert that summary judgment should be granted in their favor on Plaintiffs' conspiracy claim, Count XIII, because Plaintiffs cannot prove any actionable torts. Defendants point out that "[c]onspiracy is not 'a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury.'" (Paper 121, Attach. 1, at 34)(citing *Superior Bank F.S.B. v. Tandem Nat'l Mortgage, Inc.*, 197 F.Supp.2d 298, 319 (D.Md. 2000)(quoting *Alexander & Alexander, Inc., v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 645)). Furthermore, Defendants contend that even if any tort claims survived, Plaintiffs cannot raise a genuine issue of material fact that there was an agreement or understanding among all Defendants. Plaintiffs counter that they have satisfied all of the elements of conspiracy, so summary judgment should not be granted on Count XIII.

Plaintiffs have not satisfied all of the elements of conspiracy, so summary judgment will be granted in favor of Defendants on Count XIII. Under Maryland law, a civil conspiracy has been defined as:

> "[A] combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 385 Md. 1, 24 (2005)(quoting *Green v. Wash. Sub. San. Comm'n*, 259 Md. 206, 221 (1970)). The plaintiff must prove an unlawful agreement, the commission of an overt act in furtherance of the agreement, and that as a result, the plaintiff suffered actual injury. *Id.* at 25. The unlawful agreement is not actionable by itself; rather, the "[t]ort actually lies in the act causing the harm" to the plaintiff. *Id.* Thus, civil conspiracy is not "capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Id.* (internal citations and quotations omitted).

*Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 128-29 (2006), *cert. denied*, 548 U.S. 941 (2006). First, while circumstantial evidence may be used to establish the first element, *Daughtery v. Kessler*, 264 Md. 281, 286 (1972), Plaintiffs have not presented evidence of any agreement among Defendants to defraud Orteck, damage its business, or take its customers. Second, Plaintiffs have not shown that Defendants committed an unlawful or tortious act. Plaintiffs have not presented sufficient

evidence to withstand summary judgment on their tortious interference claim, which is the only tort still at issue at this stage of the case. Without proving a tort that Defendants committed, "civil conspiracy is not 'capable of independently sustaining an award of damages.'" *Mackey*, 391 Md. at 128 (2006). Therefore, summary judgment will be granted in favor of Defendants on Count XIII of Plaintiffs' second amended complaint.

### 6.   **Accounting and Injunction**

Defendants argue that Plaintiffs are not entitled to an accounting or an injunction, Counts XI and XII of Plaintiffs' second amended complaint, because those are remedies and not independent causes of action. Plaintiffs' response to Defendants' motion for summary judgment does not address Plaintiffs' accounting claim. Plaintiffs contend that whether styled as a cause of action or a remedy, they are entitled to a permanent injunction.

An injunction and an accounting are remedies, not independent causes of action. *See, e.g.*, *IFAST, Ltd. v. Alliance for Telecommunications Industry Solutions, Inc.*, 2007 WL 3224582, at *11 (D.Md. 2007)(citing 1A C.J.S. Accounting § 6 (2007))("An accounting is . . . a remedy, not a separate cause of action, and not available absent some independent cause of

action.").   Therefore, Counts XI and XII of Plaintiffs' second amended complaint are moot.

## III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted as to Counts VI, VII, XI, X, and XIII of Plaintiffs' second amended complaint.   Counts XI and XII are moot.   A separate Order will follow.

/s/

DEBORAH K. CHASANOW
United States District Judge